**Lonie Rogers, Administratrix of Estate of Patrick Joseph Rogers, Deceased, Appellee, v. Chicago Transit Authority, Appellant.**

**Gen. No. 44,983.**

Heard in the third division of this court for the first district at the December term, 1949. Opinion filed May 24, 1950. Released for publication June 15, 1950.

WERNER W. SCHROEDER, WILLIAM S. ALLEN, GEOFFREY B. FLEMING, and ARTHUR J. DONOVAN, all of Chicago, for appellant; JAMES O. DWIGHT, of Chicago, of counsel.

JAMES R. BRYANT, of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Lonie Rogers, administratrix of the estate of Patrick Joseph Rogers, deceased, filed a complaint in the

superior court of Cook county under the Injuries Act [Ill. Rev. Stat. 1949, ch. 70, par. 1 *et seq.*; Jones Ill. Stats. Ann. 38.01 *et seq.*] to recover pecuniary loss because of the death of Patrick Joseph Rogers on October 29, 1946, alleged to have been caused by being struck by a streetcar on Milwaukee avenue in Chicago on that date. The action was against the trustees of the corporation doing business as Chicago Surface Lines. During the trial, by agreement, the Chicago Transit Authority, a municipal corporation, was substituted as defendant. The complaint, as amended asked damages of $15,000. The jury returned two special interrogatories, one finding defendant guilty of wilful and wanton conduct, and the other finding that the decedent was not guilty of wilful and wanton conduct, and also returned a verdict assessing the damages at $12,500. Judgment was entered on the verdict and special findings. Motions to strike the answers to the special interrogatories, for judgment notwithstanding the verdict and for a new trial were overruled. Defendant appeals.

██ The jury made a special finding that the defendant was guilty of wilful and wanton conduct as the proximate cause of the injuries causing decedent's death. The judgment must be sustained by proof of this special finding. Defendant maintains that it was not guilty of wilful and wanton conduct as a matter of law or as a matter of fact. Plaintiff insists that the question was properly left to the jury and that the verdict is supported by the evidence. Defendant also maintains that plaintiff's intestate was guilty of wilful and wanton conduct both as a matter of law and as a matter of fact. Plaintiff, pointing out that the jury found by a special interrogatory that decedent was not guilty of wilful and wanton conduct, asserts that the finding is supported by the evidence. In considering the points urged by defendant, we view the evidence in its aspect most favorable to plaintiff, together with all legitimate inferences fairly tending

48

to sustain the cause of action. See *Vieceli v. Cummings,* 322 Ill. App. 559.

Milwaukee avenue runs in a northwesterly and southeasterly direction. Karlov avenue runs in a northerly and southerly direction and intersects Milwaukee avenue. Carl Schurz High School is on Milwaukee avenue, four blocks northwest of the intersection. The school lets out about 3:00 p. m. As a result the streetcars become crowded with students. At about 3:00 p. m. on October 29, 1946, decedent was waiting at Karlov avenue for a southeasterly Milwaukee avenue streetcar. It was a clear day. He was 58 years old and was employed as a temporary watchman. His eyesight and hearing were good and he was not incapacitated in any way. Ruth Schrankel and her sister, Grace Vondergeest, were also waiting for a streetcar at Karlov and Milwaukee avenues. They were called as witnesses by plaintiff. Mr. Rogers told them three streetcars had passed without stopping. A fourth streetcar came up, stopped and permitted a woman to alight from the front platform. This streetcar was crowded. Mr. Rogers and the two ladies walked toward the rear of the car to board it, but the doors were not opened. Mr. Rogers shook a rear door to cause it to be opened. The door was not opened and the car started. When the next car approached, Mr. Rogers stepped out to the track, put one foot across the rail, raised his hand and said: "By God, I'll stop this one."

The place where Mr. Rogers stepped on the rail was not where the front end of the streetcar would stop at Karlov avenue, but was somewhere near where the rear end would stop to take on passengers. These ladies said that when Mr. Rogers stepped on the rail the streetcar was about 120 feet away, traveling at the usual speed of streetcars in the block. At the inquest they said the streetcar was 50 feet away when he stepped on the rail. They made measurements before the trial and found it to be 120 feet. They said he

49

seemed to be a normal person, that he seemed to be "all right." Mrs. Schrankel said that Mr. Rogers was standing there straddling the south rail of the east-bound tracks, facing west towards the approaching car; that she could see the streetcar coming without any trouble; that it was broad daylight; that the street-car was making the usual racket a streetcar makes on Milwaukee avenue that one didn't need a bell or anything to warn that a streetcar was coming; that he (Rogers) said, "By God, I'll stop this car"; and that then he stood there. Mrs. Vondergeest said: "When I saw this streetcar at 120 feet it was coming rather rapidly and I had no trouble seeing it. I knew it was going to come down that track on a fixed rail and wasn't going to go right or left, and I suppose he knew the same thing. I didn't notice anything wrong with his eyesight or hearing. He said, 'By God, I'll stop this one' in a very soft voice. No one forced him to stand in the path of that streetcar." These ladies said that when the streetcar was about 50 feet away from him, Mr. Rogers stepped back off the track and stood facing the streetcar. They said there was nothing to prevent him from seeing the streetcar coming and that it was still going rather rapidly and was not slowing up. Mrs. Schrankel said that the rounded corner of the streetcar struck him, spun him completely around, threw him and that he landed about three feet from the curb. Mrs. Vondergeest said that the rounding part of the front of the car hit him and he went side-ways and spun around; that he was not knocked forward but that he came in contact with her when he went sideways. Mrs. Schrankel said: "At the point where he was struck, the streetcar wouldn't have stopped there anyway; it would still have to go about 20 feet before it could make a normal stop."

Sighard Semper, then a student at the high school, called by plaintiff, testified that he boarded the street-car at Addison street and stayed on the rear platform;

that it was crowded; that the rear platform was jammed; that he could not see the front platform; that when the car approached Karlov, he heard a slight thump come from the front of the car; that it sounded like raps on a table; that he was standing right in the back window; that he saw Mr. Rogers going down in the street; that he was falling when he, witness, saw him and the streetcar kept right on going; that as it approached Karlov his opinion was that the speed of the streetcar was approximately 20 to 25 miles an hour; that he did not feel any sudden slackening; that he said to his friends, "There goes a man down; looks like he's hurt," but that he did not say anything about it to the conductor; and that he did not think anyone around him mentioned it to the conductor. Frank Mucha, a student at the high school, called by plaintiff, testified that he was on the front platform of the streetcar, standing back of and to the left of the motorman; that he could see out front; that as they approached Karlov avenue he saw a man about 75 or 80 feet away standing on the rail of the streetcar track with his right hand in the air; that the car was going full speed; that he saw the motorman bring back the controller which slowed the car down a little but no sudden slackening; that when the car was between 35 and 40 feet from the man, he backed out of the rail; that the car passed the man; that he heard a thump; that the motorman brought the controller back up to full speed; that he, witness, did not know the man had been hit; that Mr. Rogers was standing directly across from the butcher shop when he first saw him, which was about 25 or 30 feet from the corner; that when the streetcar was 75 or 80 feet from the point where Mr. Rogers was standing, he, Rogers, had his hand up in the air and was facing the streetcar; that at that time the motorman turned the controller around and started to coast and that then the man moved out of

51

the way; that he stepped off the streetcar track about a foot or two when the streetcar was 35 feet from him; that when the streetcar was 35 feet from him he was not in its path; that he, witness, did not see him come in contact with the streetcar and did not know if the man changed his position after he lost sight of him; that the man was not out of the path of the entire streetcar when he was 35 feet away; that he stood there facing the streetcar; that he, witness, heard a noise to his right like a thump, coming from the side where you step into the interior of the car, about six feet behind the front of the streetcar; that he could not tell whether Mr. Rogers struck the side of the car with his hand; that he did not say anything to any of his friends or to the motorman; and that as far as he knew "there was no one saw him struck by the front of the street-car." Plaintiff also called William Lancaster, Reginald Koss and Thomas Windle. These three were students and were standing on the front platform of the car. They saw Mr. Rogers standing on the track with his hand upraised and saw him jump or step back. They all heard a thump or knock as the car passed. Thomas Windle told his mother about the incident when he got home and thought some one had been hurt. Reginald Koss also told his parents when he got home and thought the man had been hurt. Thomas Kowalski, a student, called by plaintiff, was standing in the doorway above the front platform facing toward the front of the car. His testimony corroborated that of the four students who were standing on the front platform. The names of the students who testified were obtained through the posting of a bulletin at the high school the next day.

George Thompson, the conductor of the streetcar, was called by defendant. He did not know of the occurrence until the following day. He testified that the car stopped at the high school and loaded up with

52

school children; that the rear platform was crowded; that they could not get any more on and he gave the motorman a signal at Keeler avenue not to make another stop; that at no time while they were passing Karlov avenue did anyone say anything about "this accident happening"; that when they were approaching Karlov avenue the car slowed up like it would for any intersection; that he felt the car grab the air and could hear the sand and hiss of the air; and that it was not sudden. At the inquest he said that it tossed him back toward the bulkhead just for a moment and then seemed to glide along. He heard the sound of the bell and sand but did not hear any bump or anything of that kind. John Wucke, the motorman, called by defendant, testified that when he was about 150 feet from the corner of Karlov avenue and going about 18 or 20 miles an hour, he noticed a man standing about 50 feet back from the corner; that he, witness, threw off the power and slowed down to about 14 or 15 miles an hour; that when the car got within 40, 50 feet of the man, he stepped out, put his foot to the rail and gradually raised the right hand; that he, witness, applied the emergency, sounded the gong and within a second or so the man stepped back; that when he was five feet past the man he released the emergency, saw the crossing was clear and proceeded on to Pulaski; that at 14 or 15 miles an hour it would take close to 100 feet to stop with the load the car had; that the man was about 20 feet from the car when he stepped off the track, at which time the car was going 10 or 12 miles an hour; that at such speed it would take at least another 15 to 20 feet to stop; that as the car passed him, the man was clear of the track, about a foot away from the right front platform; that he did not hear a noise as he passed the man; that as far as he knew, no part of the streetcar struck the man; that there were 12 or 14 people on the front platform; that no one called his

53

attention to any noise or to the streetcar striking anybody or that anybody struck the streetcar; and that the first time he knew that a person had been involved in an accident was the following day when the clerk asked him about it. On cross-examination the motorman said he was (at the time of the trial) in the employ of the Post Office; that he left the streetcar company voluntarily; that he was within 40 or 50 feet of the man when he stepped out of the way; that he watched the man as he stepped out of the way; that he did not see the man get hit and did not hear anything; that he cut off his power when he was 150 feet from the intersection and before he saw the man step into the tracks; that he pulled the controller back; that by the time he reached the place where the man stepped on the tracks his speed had been reduced from 20 miles to about 14 or 15 miles; that he applied the emergency brakes, sanded the rail and sounded the gong; and that going at 14 or 15 miles an hour when he sanded the rail and put on the emergency brakes it would take at least from 75 to 100 feet to stop. At the inquest he said it would take at least 60 feet to stop with the load he had and that he had the emergency on for about 30 feet or about 45 feet and was about 5 feet past the man when he released his brakes. On the stand he said he had the emergency on an average of about 30 feet and reduced his speed from 15 miles an hour to 8 miles an hour, when he released it.

In *Walldren Express & Van Co. v. Krug,* 291 Ill. 472, the court said (476):

"Whether the negligent conduct of a defendant which has resulted in injury to another amounted to wantonness is a question of fact to be determined by the jury, if there is any evidence in the record fairly tending to show such a gross want of care as indicates a willful disregard of consequences or a willingness to inflict injury. . . . An intentional disregard of a

54

known duty necessary to the safety of the person or property of another and an entire absence of care for the life, person or property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal willfulness such as charges the person whose duty it was to exercise care with the consequences of a willful injury. . . . A charge of wantonness implies an act intentionally done in disregard of another's rights, designed and intentional mischief, and not a mere negligent omission of duty."

In *Kalinski v. Williamson County Coal Co.,* 263 Ill. 257, the court said (265):

"In negligence, merely, there is no purpose to do a wrongful act, and there must be some evidence which will authorize the presumption of a conscious or intentional disregard of duty or an intention to injure, in order to justify an inference of willfulness."

In *Bartolucci v. Falleti,* 382 Ill. 168, the court said (174):

"Plaintiff's right to recover is, consequently, dependent upon proof that the accident causing the injuries was occasioned by defendant's wilful and wanton misconduct. Ill will is not a necessary element of a wanton act. To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury. An intentional disregard of a known duty necessary to the safety of the person or property of another, and an entire absence of care for the life, person or property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal wilfulness."

55

See also *Heidenreich v. Bremner,* 260 Ill. 439; *Bernier v. Illinois Cent. R. Co.,* 296 Ill. 464.

██ According to the witnesses the streetcar was 50 to 120 feet from the place where Mr. Rogers stood with his foot across the rail when he stepped out there, or when the first witness saw him. He stood there facing the car 'with his hand up at the time he made the exclamation that he would stop the car. Undoubtedly, he saw the car coming. None of the witnesses considered that he would not step off the rail and out of the way of the streetcar before it reached him. The weight of the streetcar, according to the evidence, was approximately 25 tons and it was loaded with passengers. At 14 or 15 miles an hour it would require close to 100 feet to stop. The motorman said the streetcar was going about 18 or 20 miles an hour. The boy who was on the rear platform said that the speed of the car as it approached Karlov avenue was approximately 20 to 25 miles an hour. He also said it was moving at a speed slower than he could ride a bicycle. Since the motorman and the other witnesses expected and had a right to expect that Mr. Rogers would step off of the rail before the car reached him, there was no occasion for trying to make an emergency stop. When the car was from 20 to 50 feet from him, Mr. Rogers stepped off of the track. The motorman and others on the front platform watched him as he stepped out of the way and they did not see Mr. Rogers get hit. The motorman did not hear anything and did not know that the man came in contact with the car until he was asked about it the following day. In our opinion there was no conscious or intentional disregard of a duty and no intention to injure. There was no entire absence of care and there was no conscious indifference to consequences or designed and intentional mischief. That the motorman was justified in thinking that the

56

man got safely out of the way is supported by the fact that none of the witnesses who were on the front platform and whose view of the situation was similar to that of the motorman, knew at the time that the man came in contact with the streetcar. There were a number of high school students on the front platform, five of whom testified at the trial. If the circumstances were such that the motorman wilfully and wantonly caused the streetcar to strike Mr. Rogers, or if the conduct of the motorman was such as to indicate to those present a conscious or intentional disregard of duty, a conscious indifference to consequences, designed or intentional mischief, or an intention to injure, it would be reasonable and natural that those persons would notice it and say something to each other or to the motorman. None of them said anything about it to any of the others, or to the motorman. The fact that the streetcar did not stop at Karlov avenue but went on to Pulaski, was no part of the proximate cause because the mishap had occurred before the car reached the stopping place at Karlov avenue and neither the motorman nor the conductor had knowledge of it. We are satisfied that there is no evidence fairly and reasonably tending to prove that the mishap was caused by wilful and wanton conduct on the part of the servants of defendant.

■ ■ We turn to a consideration of defendant's contention that plaintiff's intestate was guilty of wilful and wanton conduct. Contributory wilful and wanton misconduct, if established, is a complete defense to an action charging the same wrong. *Prater v. Buell,* 336 Ill. App. 533; *Lane v. Bobis,* 340 Ill. App. 10. Mr. Rogers stood on the rail when the streetcar was 50 to 125 feet from him. He remained standing there until the car was from 20 to 50 feet from him and then stepped off the track. The only purpose of stepping off of the track was to remove himself from the danger

in which he had knowingly, wilfully and deliberately placed himself. There was nothing to prevent him from stepping far enough to avoid the danger which his own deliberate conduct had created. We find, as a matter of law and as a matter of fact, that the evidence, viewed in its aspect most favorable to the plaintiff, shows that Mr. Rogers was guilty of wilful and wanton conduct which proximately contributed to bring about the mishap which resulted in his death, and that there was no basis for either of the jury's special findings or for the verdict.

For the reasons stated the judgment of the superior court of Cook county is reversed and the cause remanded with directions to enter judgment for defendant and against plaintiff.

*Judgment reversed and cause demanded with directions.*

LEWE, P. J., and KILEY, J., concur.