Oscar Nelson, as Auditor of Public Accounts of the State of Illinois v. John B. Colegrove and Company State Bank.

Millikin National Bank and First National Bank of Chicago, Appellees, v. Robert G. Earley, Receiver of John B. Colegrove and Company State Bank, Appellant.

Gen. No. 8,598.

Heard in this court at the October term, 1931. Opinion filed February 1, 1932.

Oscar J. Putting, for appellant.

McMillen, McMillen & Garman and Hogan & Coale, for appellees.

Mr. Justice Shurtleff delivered the opinion of the court.

This proceeding involves two intervening petitions by the Millikin National Bank and the First National Bank of Chicago in a general equity suit, brought by the Auditor of Public Accounts of the State of Illinois, in winding up the affairs of the John B. Colegrove and

Company State Bank of Christian county in this State, in the circuit court of that county.

In 1928 the Auditor of the State of Illinois notified the John B. Colegrove and Company State Bank, then a going concern, to reduce its real estate holdings, and it appears that the Bank then had the ownership of the "Minnis Farm." The transaction, as stated by appellees, is as follows: "Following that, a plan was entered into whereby Jesse L. Patterson, one of the directors, should accept for the bank the conveyance of the real estate referred to as the 'Minnis Farm,' this farm being about to be acquired because of the insolvency of the owner, one W. G. Minnis, and of his indebtedness to the said bank. This farm was then acquired through the bankruptcy of Minnis and was conveyed direct to Jesse L. Patterson, he acting as a trustee for the Colegrove bank, according to the terms of an agreement between Patterson and the John B. Colegrove & Co. State Bank. Following this a mortgage was obtained from the Illinois Joint Stock Land Bank of Monticello, Illinois, to secure the sum of $19,000 borrowed from it. The purchase price of the farm was $45,045. The balance of the purchase price of $26,045 was represented by five notes signed by Jesse L. Patterson and delivered to the Colegrove bank directors. A quitclaim deed conveying this real estate to the Colegrove bank was executed and delivered by Patterson to the cashier of the bank, he to hold the same as an escrowee. According to the agreement between Patterson and the bank and the resolution, both above referred to, the $26,045 notes of Patterson were not to be treated as personal indebtedness of Patterson and the deed to the farm was not to be recorded or treated as delivered until the notes had been delivered back to Patterson and canceled.

"Just prior to the closing of the Colegrove bank it borrowed large sums of money from the First National Bank of Chicago and delivered to the First National

Bank of Chicago divers notes, as collateral, among them two being of the series of five notes executed by Patterson, making up the $26,045, the two notes totaling $10,500. About the same time money was borrowed from the Millikin National Bank of Decatur and one of the series of five notes, being a $5,000 note of Jesse L. Patterson, was delivered to the Millikin National Bank as security for its loan among other notes. Of the other of the five notes made by Patterson one was delivered to Josiah Hall, and one was retained by the Colegrove bank. At the date of the closing of the bank, therefore, the $26,045 notes of Patterson were distributed as follows: two notes to First National Bank of Chicago; one note to Millikin National Bank of Decatur; one note to Colegrove bank, and one note to Josiah Hall. Josiah Hall was a director in the Colegrove bank and advanced the bank large sums of money. He had been acquainted with this transaction throughout, and it is the contention of the appellees that he is in no better position than the insolvent bank and its receiver, the appellant herein. The attorney for the Josiah Hall estate was in court as a witness for the appellees. The Hall estate has made no claim for a part of this money."

Appellant has a different understanding as to some of these facts which will be noted later.

On trial Jesse L. Patterson testified as follows: "The auditor informed us that we would have to take the real estate, or a big portion of it, out of the assets of the bank, and must be done in some way or other, and so we finally decided that the only way we could possibly get rid of some of the real estate was for some of the directors to take title to the land and to borrow money on it in order to take care of these objections.

"I took title to the W. G. Minnis land. The bank did not have title to the land at the time. It was a foreclosure proceeding, and I got title through the receiver under the foreclosure.

"It was sold through the Federal Court, in bankruptcy and I got title that way."

Q. "And the notes you have described represent the difference of $19,000.00 borrowed on it and the amount owing the bank at that time?

A. "Yes, sir."

"I think I took title to that land on March 12, 1927, and I made a deed the same day I took title to the John B. Colegrove and Company State Bank. I delivered it to H. E. Gollogher, cashier. I never had that deed back again. None of the notes were ever returned to me or released. So far as I know they have never been cancelled.

"I had other notes in the bank. There was a distinction between my signature on these notes and other notes I had in the bank."

It was stipulated that the receiver recorded the deed in question in the county recorder's office of Christian county, having found the deed among the papers and effects of the John B. Colegrove and Company State Bank shortly after he was appointed receiver; that respondent was appointed receiver on or about the 4th day of November, 1929.

Patterson further testified: "The first I knew that some of the $26,000 worth of notes which I signed were in the hands of the Millikin National Bank was on the evening the John B. Colegrove and Company Bank closed. That was the first information I had. At the same time I found that some of my notes were in the hands of the First National Bank of Chicago. I got this information from the books—from the note record in the bank. The John B. Colegrove and Company State Bank note record—then was when I got the note record and made an examination and looked at my account to see what had happened to my notes and I found, as I looked in the 'P's' in the note book, I found there was one $5,000 note there and that was the only one that was left in the bank.

"That was the first investigation I had made concerning where my notes were. That was in October, along the first part of October, 1929.

"I knew that the John B. Colegrove and Company State Bank was examined by a bank examiner two or three or more times each year."

On July 8, 1929, Patterson, with others, signed an agreement for a valuable consideration with the First National Bank of Chicago, by which the signers jointly and severally obligated themselves to pay to and indemnified said First National Bank and guaranteed that they would pay all loans, discounts and overdrafts made for said John B. Colegrove and Company State Bank, by said bank which was a continuing guarantee, and provided for the depositing of collateral notes of the bank as security for any and all such loans, discounts and overdrafts, with the right to exchange collateral paper and substitute new paper, whenever required. A similar contract and guaranty was signed by Patterson to and with the Millikin National Bank of Decatur, upon both of which contracts, the John B. Colegrove and Company State Bank and Patterson were much indebted at the time these proceedings were commenced.

A document was offered in evidence during the trial, known as Exhibit 14, while Patterson was testifying. It is as follows: "Whereas, in the conduct of its business it becomes necessary for the John B. Colegrove and Company State Bank to take title to the farm formerly owned by W. G. Minnis either in their own corporate name or in the name of some person selected by the board of directors of said bank and the board of directors having elected to having said premises deeded to Jesse L. Patterson as a matter of convenience in handling said premises and account for the proceeds and expenses incurred; and

"Whereas, in financing the acquisition and operation of said farm it has become necessary that certain

notes or obligations have been incurred by said Jesse L. Patterson and from time to time be incurred in the future for like purposes; and

"Whereas, said Jesse L. Patterson and his wife have, as a matter of equity and precaution, executed their certain deed conveying the above mentioned premises to John B. Colegrove and Company State Bank, said deed being delivered into the hands of the cashier of said bank for the purpose of preventing said farm from becoming a part of the estate of said Jesse L. Patterson, who is hereby understood to be only the nominal record owner thereof;

"Therefore, be it resolved, that the deed heretofore executed and hereinabove mentioned shall be held by the cashier of said bank as a delivered deed but which shall not be placed of record unless at the same time all notes executed to said bank by said Jesse L. Patterson which are in any way an obligation incurred in the acquisition or operation of said W. G. Minnis farm by him shall be cancelled and delivered to said Jesse L. Patterson or his legal representatives without payment by him; and

"Be it further resolved, that no note executed by said Jesse L. Patterson for any of the aforementioned purposes or for any purpose whatever incurred in the management of said farm or by virtue of being the nominal record owner thereof shall be considered as a personal obligation against said Jesse L. Patterson in any case whatever except in case that a loss shall be sustained by said bank by virtue of acquiring said premises said Jesse L. Patterson shall have no further loss or obligation on account of said ownership, operation or obligations incurred as hereinbefore provided except his legal obligation as director or stockholder in said bank, and

"Be it further resolved, that as a matter of identification of the notes which shall be executed in all instances pertaining to obligations incurred as herein

provided it shall be the duty of any executive officer of this bank who shall receive for said bank any such note or any renewal thereof to see that said note is signed by and in the name and style of Jesse L. Patterson, whereupon it shall be considered as an obligation on account of said farm and provided for herein and that any and all other obligations which may be from time to time owing said bank by said Jesse L. Patterson shall be signed by and as J. L. Patterson and when so signed shall not be considered as an obligation hereunder.''

Patterson testified that he signed the notes to help the bank, ''just as any director does; they do everything to assist the bank to make it a going concern.''

Patterson further testified: ''The understanding was, I was not to be held liable, and there was no reason why I should be held liable.

''That understanding was had in an open board meeting, and the president knew. The resolution was read before the board, I don't just remember who was there, and I would not attempt to state just what directors were there. I am referring to those members who were there. The board of directors had a regular record book in which it kept its records of its meetings. The minutes were read from time to time at the board meetings and the board passed on the minutes.

Q. ''Did you ever hear these minutes read from that book at any time concerning a resolution of that kind?''

A. ''Yes, sir, I did, at the next meeting.''

''He had his book there before him. I never looked at the minute book. The cashier, H. E. Gollogher, had the minute book; I know it was a regular meeting; we very seldom had a special meeting—anyway, a special meeting would not be called for something like that; it would be attended to at a regular meeting.

"As a rule I did not consult the minutes, the minutes were read off by the cashier. I never went through the minute book to examine it leaf for leaf. The notes I had signed, had no writing or anything on them that would distinguish them from a note I gave where I borrowed $26,000 outright."

"Josiah Hall was one of the directors and I think he knew about this $26,000 worth of notes. There is no question in my mind about it. I wouldn't say he was at that directors' meeting. It was discussed afterwards quite a few times at the directors' meeting. He wasn't there as frequently as others—he was poorly. I don't remember if he was there at the time my transaction was discussed. I never told him personally the circumstances under which I executed these notes. I don't know whether anybody else did.

"I am not interested in who should get the proceeds of the sale of the Minnis farm. I was interested in them getting as much as possible for the Minnis farm —it would be just that much for the benefit of the bank.

Q. "When you say for the benefit of the bank, which bank do you mean, the First National Bank of Chicago or the Millikin Bank of Decatur?"

A. "I mean the John B. Colegrove and Company State Bank."

"I first ascertained that these notes were not in the possession of the Colegrove Bank, but that some were in the possession of the First National Bank of Chicago, and some were in the possession of the Millikin Bank, the night the bank was closed, Thursday evening.

Q. "You inquired, when the bank closed, concerning your own protection, is that right?

A. "Naturally."

Prior to that I was worried many times.

Q. "You never made any inquiry concerning the status of these notes?

Mr. Hogan: "That is objected to."

"Mr. Nicholson nor anyone else in the Auditor's office knew what was going on when the deal concerning the Minnis land was consummated. They did not know anything of what was contemplated by me or any of the other officers of the bank.

"Mr. Jones made the final examination and Mr. Rodenberg was placed in charge afterwards. He looked after the assets of the bank until a receiver was appointed."

And Patterson corrected his testimony, as follows:

Q. "In answer to a question on cross-examination, as to whether you ever said anything to Mr. Nicholson about these notes amounting to $26,545, I understood you to say you had not talked to him about it; state if you have any explanation to make about that?

A. "I remember this: at one of the board meetings Mr. Nicholson was talking about the financial responsibility of the board of directors, and I told him I was responsible for the amount of money I owed to the bank, which was $380."

Then I told him that these notes affecting the Minnis farm, that I was doing that for the benefit of the bank, in order to get the real estate out of the assets."

A red, leather-bound book was produced by appellant, the receiver of the bank. It was identified by Patterson as the minute book of the board of directors of the J. B. Colegrove and Company State Bank, kept by H. E. Gollogher, the cashier; it nowhere contained any resolution such as Exhibit No. 14, and the book contained no record of any transaction as to the "Minnis Farm" or the Patterson notes.

The "Minnis" lands were sold by the receiver for $4,049.43 over and above the amount of the mortgage, and is the amount in dispute. The court found by its

decree that the prayer of the intervening petition be granted and that the proceeds derived from the sale of the said real estate, less the amount due on account of said sale, being the sum of $4,049.43, be applied by the receiver to the discharge of the claims of the petitioners in proportion of the amounts of their respective claims.

Appellant, receiver, has brought the record, by appeal, to this court for review.

The Zeigler notes and the sale of the South Dakota lands do not seem to be involved in this proceeding.

Appellees' contention can better be expressed in their own language: "It is the contention of the appellees that there is no showing of any right whatever of the Colgrove bank or its receiver to the 'Minnis Land' or the proceeds of it, except as a security for the Patterson notes given in relation to the Minnis transaction; that the notes were secured by the deed to the land and therefore when the notes were transferred the security passed with the notes; that, therefore, the balance of the sale price, after the costs of sale and the first and prior lien were discharged, belongs to the innocent holders for value of the notes, namely, the appellees herein as their interest appear."

In other words, appellees claim an equitable mortgage upon the "Minnis Lands" growing out of the execution of the Patterson notes and Patterson's conveyance of the lands to the bank, and the agreement Patterson claims to have had with the bank when he made the conveyance. The claim is made upon the presumption that Patterson did make the escrow agreement as to the deed with the bank. If he made no such escrow agreement as to the deed, no such claim could be made.

The series of notes executed by Patterson, claimed to have been secured by the escrow agreement, were dated June 8, 1928. The conveyance of the "Minnis

Lands'' by Patterson to the Colegrove Bank is no-
where shown in the record, but Patterson testified that
the conveyance was made March 12, 1927, so that there
is not shown in the record any connection between the
execution of the notes and the execution of the convey-
ance. The wording of the pretended resolution, Ex-
hibit 14, is also strongly corroborative that no notes
were executed until long after the deed was deposited
in the bank. The purpose stated in the instrument as
a ground for execution, was ''as a matter of equity
and precaution, . . . for the purpose of preventing
said farm from becoming a part of the estate of said
Jesse L. Patterson, *who is hereby understood to be
only the nominal record owner thereof.* The next
clause recites ''that the deed *heretofore executed* shall
be held by the cashier of said bank *as a delivered deed*
but which shall not be placed of record unless at the
same time all the notes executed to said bank by said
Jesse L. Patterson which are in any way an obligation
incurred in the acquisition or operation of said W. G.
Minnis farm by him shall be cancelled and delivered
to said Jesse L. Patterson, . . . without payment
by him, . . . and said Patterson shall have no loss,
. . . except his legal obligations as director or stock-
holder in said bank.''

All of the resolution and agreement up to this point
and from this point to the end, has no reference what-
ever to any notes executed by Patterson, other than
notes executed by him in ''the acquisition and opera-
tion of the 'Minnis Farm.' '' Patterson's testimony
as to this resolution or agreement is peculiar. He
says: ''I have seen the document marked Exhibit 14
before. This is a copy of the original filed with the
John B. Colegrove and Company State Bank. *Of
course I don't* remember the date. It was at or about
the time I signed certain notes at the bank. It was in
connection with these notes that that matter was pre-

sented. It was at a board of directors' meeting.''
And over the objection of counsel for appellant the
court permitted the witness to testify that the resolu-
tion was passed and adopted.

Patterson further testified that the original was left
with H. E. Gollogher, the cashier. It was shown by
the testimony of one witness that Gollogher was con-
victed in the same court and sent to the penitentiary.
As to the witness Patterson, concerning an instrument
which was his protection from paying notes in the
amount of $26,000, it seems improbable he would be
so careless as not to have a copy of his own, not to
know the date of the instrument, and not to have some-
one's signature attached to it or, at least, being one of
the directors of the bank, not to have seen to it that it
was a part of the record of the bank. It is not found
in the records of the bank and is nowhere mentioned
in the minutes of the meetings of the board of direc-
tors. No one, director, president, clerk, cashier, or
attachee of the bank, ever saw it, according to the
proofs, except Patterson, and the best, in substance,
as to the agreement that can be furnished the court is
a purported copy of a pretended resolution or agree-
ment said to have been in the custody of a man pre-
sumptively in the penitentiary. It is more than prob-
able that on March 12, 1927, when Patterson had se-
cured title to the ''Minnis Farm'' and reconveyed it to
the bank, as he states he did, some such contract, and
quite possibly the exact resolution and contract pre-
sented, was entered into and agreed to by Patterson
and some officer of the bank as to any and all ''obliga-
tions incurred in the *acquisition* or *operation* of said
'Minnis Farm' '' but the notes in question were in no
manner incurred in either the ''acquisition'' or ''oper-
ation'' of the farm. There is no pretense that that
was the purpose of the notes. The farm was fully ac-
quired in March, 1927, and the notes were not given
until June, 1928.

Patterson does not claim he gave the notes in the acquisition of the farm or in the operation of the farm, but he says he gave the notes to help the bank, to *make the bank a going concern.* If he gave the notes for the acquisition or in the operation of the farm, he did not give the notes to make the bank a "going concern." The signature to the notes "Jesse L. Patterson" and not "J. L. Patterson" signifies no more than that Patterson did not give the note for "money loaned" to him. There is no showing that any agreement of escrow or otherwise was made with the bank. Section four of chapter 16½ of the Revised Statutes, Cahill's St. ch. 16a, ¶ 4, provides: "The directors shall cause to be kept suitable books of record of all the transactions of the bank or association." Also: "The directors of any bank or association organized under the provisions of this Act, shall hold regular meetings at least once each month," and there shall be present a quorum, as may be prescribed by the by-laws of such bank or association, etc.

The bank can only be held liable upon contracts for actions taken by its board of directors, of which record must be kept, or by the action of its officers, acting within their authority. (*People ex rel. Greenwood v. Board of Supervisors of Madison County,* 125 Ill. 334; *Village of Bellwood v. Galt,* 321 Ill. 504, 508.)

In *People ex rel. Greenwood v. Board of Supervisors of Madison County, supra,* the court held: "The principles announced seem to be well supported by authority. Where the law requires records to be kept, they are the only lawful evidence of the action to which they refer, and such record cannot be contradicted or supplemented by parol. The whole policy of the law would be defeated if they could rest partly in writing and partly in parol. *Stevenson v. Bay City,* 26 Mich. 44; *Hall v. People,* 21 id. 456; *Morrison v. City of Lawrence,* 98 Mass. 219; *Hanneman v. Fire District,* 37 Vt. 40; *Mayhew v. District of Gay Head,* 13 Allen, 129.

502

So where county commissioners and township trustees were required by law to keep a true record of their proceedings, it was held that they could 'only speak by their record' when legally assembled. (*Commissioners of Fayette County v. Chitwood,* 8 Ind. 504.) And where school districts are required by law to keep an account of their proceedings by a sworn clerk, such proceedings can only be proved by the record. Offered parol proof was rejected. (*Jordan v. School District,* 38 Maine, 164.)''

In *Village of Bellwood v. Galt, supra,* the court held: ''When a record of its proceedings is required to be kept the record is the only lawful evidence of its action, and it cannot be contradicted or added to by parol. *People v. Madison County,* 125 Ill. 334; *People v. Smith,* 149 id. 549; *People v. Carr,* 231 id. 502; *People v. Warren,* id. 518; *Southworth v. Board of Education,* 238 id. 190; *City of Belleville v. Miller,* 257 id. 244; *People v. Toledo, St. Louis and Western Railroad Co.,* 270 id. 472; *People v. Hartquist,* 311 id. 127.''

No record is shown of any action taken by the board of directors, and no officer with any authority is shown to have concurred in the resolution or agreement of escrow or an agreement in any form.

It must, therefore, be held as a fact in this case that the record does not show any fact instrument, document, escrow, equity or thing, connecting the notes in question with the ''Minnis Farm,'' or any part of it, and that the purported resolution and contract, Exhibit 14, had no reference to the notes in question, and that the notes in question were only given in aid of the bank, and to assist in making the bank a ''going concern.''

The note, one of the series held by the bank in the hands of the receiver, was of equal force and effect for the benefit of the depositors and creditors, as the notes held by appellees. *Golden v. Cervenka,* 278 Ill. 409.

We know of no reason why the note held by Josiah Hall is not of the same classification, subject to his liability as a stockholder and director.

The receiver of an insolvent bank, when attempting to marshal the assets of such bank for the benefit of creditors, is in law an innocent holder of such assets and may maintain an action at law or in equity, even where the bank could not do so. (*Golden v. Cervenka, supra; Niblack v. Farley,* 286 Ill. 536; *Mueller v. Novak,* 251 Ill. App. 262, 269.)

It follows that appellant in this cause was fully within his rights in selling the equity in the "Minnis Farm" lands in question, and preserving the funds received for the creditors of the bank.

Accordingly, the decree of the circuit court of Christian county, upon the intervening petitions as to the "Minnis Farm" lands, is reversed.

*Reversed.*