Mary Scerrino, Administratrix of Estate of Joseph Dusik, Esther R. Bourne, Sylvia Roberti and Yustina Leonavicius, Appellants, v. Maxwell Dunlap, Appellee.

Gen. No. 46,936.

First District, Third Division.

June 21, 1957.

Released for publication September 30, 1957.

Peter Fitzpatrick, of Chicago (Charles D. Snewind, of Chicago, of counsel) for appellants.

Wyatt Jacobs and Jacobs, Miller, Hopkins & Rooney (Joseph B. Lederleitner, of Chicago, of counsel) for appellee.

JUDGE FRIEND delivered the opinion of the court.

This is a consolidated suit by four plaintiffs for personal injuries which resulted when the parties were struck by an automobile driven by defendant. The jury returned answers in response to special interrogatories that neither the defendant nor the plaintiffs were guilty of wanton and wilful misconduct which proximately caused the accident, and that the defendant, together with all the plaintiffs, was guilty of negligence which proximately contributed to cause the occurrence. Along with the interrogatories, the jury returned separate verdicts finding the defendant not guilty as to each plaintiff, and judgments were entered accordingly. Plaintiffs filed a post-verdict motion to set aside the answers to the interrogatories, and also the verdicts and the judgments, and to grant them a new trial; this motion was overruled. They appeal from the verdicts and judgments finding defendant not guilty, and from the order denying their post-trial motion.

The accident occurred at the intersection of Western Avenue and 35th Street in Chicago shortly before seven o'clock on the morning of January 12, 1954. The temperature was below zero, the weather clear and the visibility good. Western Avenue is a north-south thoroughfare measuring fifty-five and one-half feet from curb to curb, with two lanes of streetcar tracks thereon. The area between the two tracks is somewhat off center, being about three and one-half feet closer to the west curb. Thirty-fifth Street, which intersects

Western Avenue at right angles, is forty-two feet wide. Both streets are paved with asphalt or cement except for the portion of Western Avenue carrying the car tracks, which is brick. The sidewalk on the north side of 35th Street, west of Western Avenue, is twelve feet wide. On the northwest corner of the intersection of Western Avenue and 35th Street there is a two-story brick and frame building, the ground floor of which is occupied by a soda fountain and restaurant. There are no car tracks on 35th Street, which is used by CTA buses. All four corners of the intersection are equipped with traffic-control signal lights designed in the green-amber-red-walk sequence.

Joseph Dusik testified that at the time of the accident he was on his way to work. He had gotten off a southbound Western streetcar at 35th Street and, because of the subzero temperature, had gone into the restaurant on the northwest corner of Western and 35th to wait for the westbound 35th Street CTA bus to continue his trip to work. Some fifteen to twenty passengers had taken refuge in the restaurant from the cold, and on seeing the bus approach, they left the restaurant and started to walk east on the 35th Street north crosswalk toward the bus stop on the northeast corner of the intersection. "I was just about in the west side streetcar tracks," Mr. Dusik continued, "when the accident occurred. . . . . I was walking. Nobody was running that I know of. The lights were green for 35th Street. The only thing I know was that something hit me in the back and I was rendered unconscious. I came to in the hospital and it was three days before I knew anything."

The other three plaintiffs gave substantially similar testimony with respect to the accident. They all stated that they walked across Western Avenue with the green or walk light. Both Esther Bourne and Yustina Leonavicius, like Joseph Dusik, lost consciousness after

358

being struck by defendant's automobile; only Sylvia Roberti remained conscious, but she too, like the other plaintiffs, sustained serious injuries. Allie Dale Cooper, as an occurrence witness testifying on behalf of plaintiffs, corroborated their version of the accident. She too had been one of the group of people waiting in the restaurant and, with them, had started to cross Western in order to board the 35th Street bus; as she reached the car tracks she was struck by defendant's automobile and lost consciousness.

Edward S. Grybas, a Chicago police officer for the last nine years, was, with his partner Peter Jandersits, on duty in a squadrol car. At approximately 6:40 a.m. they received a call relative to the accident and immediately went to the scene. When they arrived at the intersection, so Officer Grybas testified, a group of people were scattered and lying about the intersection: one was lying in the northbound car track approximately twenty feet south of the north crosswalk; another in the southbound car track about fifteen feet south of the north crosswalk; a third was lying in the street some four feet from the southeast curb and near the south crosswalk; a fourth was lying on the southwest corner about five or six feet from the south crosswalk; and a fifth individual was lying about four feet from the northwest corner near the west crosswalk of 35th Street. Officer Grybas stated that he arrived at the scene of the accident about three minutes after he received the call, and immediately thereafter had a conversation with defendant at the scene, the substance of which is shown in the following excerpt from the abstract: "I saw the defendant, Maxwell Dunlap, at the scene of the accident and I had a conversation with him. When we arrived at the scene I said 'good Lord what happened' and this man came up to me and said 'I hit these people.' I said 'you struck all these people down' and he said 'Yes, sir, I did.' I

359

said, 'Well, what happened?' and he said 'I don't know exactly what happened.' He said it happened so fast that he didn't even see them and that he had difficulty with visibility through the windshield because of the fact 'that it was frosted.'"

Defendant was the only occurrence witness testifying in his own behalf. He stated that on January 12, 1954 he owned a 1938 Buick four-door sedan which he had purchased in September 1951. On the night preceding the occurrence he had parked his car in front of his residence on West 21st street, and on the morning of the date in question came out early, got into his car and started the motor. He opened the windows "so that the car wouldn't steam up on the inside," sat in it for three to five minutes warming up his motor, and then turned his defroster on "to keep them [the windows] from frosting up," since the temperature was around zero. On leaving his home he proceeded to Western Avenue, then drove south on that thoroughfare along the right-hand side of the southbound lane. He testified that visibility was good, and that the "only thing . . . on my windshield was approximately a half an inch of frost along the upper part and on the outer edges of the windshield." He had his lights on and could see several hundred feet. As to the occurrence, he testified as follows: "As I approached 35th Street, between 34th and 35th Street I noticed a traffic light at 35th Street. I was about a half a block away and the light was changing from red, amber to green. I was at that time on the west side of the car tracks and traveling at a speed of between 20 and 25 miles an hour. As I continued toward 35th Street the lights were still green. They were green for north and south traffic at the time of the accident. When I was about 20 to 30 feet from the intersection I noticed some people on the northwest corner of the curb. They didn't cross. No one started

360

to cross until I was 20 to 30 feet from the intersection. Then there was about a half a dozen or more people dashed out in front of my car and dashed across the street. When I was about 20 to 30 feet from the intersection, I applied my brakes as fast as I could to keep from hitting the people. My car stopped on the crosswalk. It may have been a foot or two over the south part of the north crosswalk on the northwest side. . . . I traveled about 30 feet from the time I first saw the people until I came to a complete stop. I did not have any difficulty in seeing the people nor in seeing the lights. . . . There were several people who dashed out in front of my car. I wouldn't say how many but there were probably six to eight. It happened so suddenly that I don't remember exactly how many were there. . . . I don't think any of the people that crossed in front of my car got completely across. As far as I know my car collided with only four people. . . . I think there were some people there that weren't involved in the accident or weren't hurt. I believe these people were crossing Western Avenue from west to east. I wouldn't say that there were as many as twenty people crossing Western Avenue at the time. I have traveled this route south on Western Avenue many times and I knew that 35th Street was a transfer point. I didn't see any of these people come out of the restaurant it happened so fast. The people dashed right out in front of me. I did not see any people on the east side of the street before the accident." On cross-examination defendant at first categorically denied that he made any statement to any policeman about the windshield being frosted, but subsequently admitted that he made a statement to an officer at the hospital that his windshield "was frosted a little bit."

As the principal ground for reversal, it is urged on behalf of plaintiffs that the verdicts and the judg-

ments were contrary to the manifest weight of the evidence and were produced by the prejudicial misconduct of defendant's counsel during the course of the trial and in his argument to the jury, that the court erred in submitting the question of plaintiffs' wanton and wilful conduct to the jury, and that the instructions were improper, repetitious and many of them of a peremptory nature. It appears that after several days of trial and after four witnesses had testified on behalf of plaintiffs, the court was forced to withdraw a juror and declare a mistrial because of the impropriety of counsel for defendant in referring to the police report and to an alleged self-serving statement made by defendant to a police officer at the scene of the accident. The new trial was then resumed. Plaintiffs devote some twenty pages of their brief to alleged improprieties, including repeated efforts of counsel to elicit answers to questions where objections had been sustained, to the failure of the court to stop argument pertaining to alleged misstatements of the law or facts, and various other matters too lengthy to discuss within the confines of this opinion. However, since we are convinced that plaintiffs' case was prejudiced by the interrogatories submitted and by the instructions given to the jury, we consider it unnecessary to decide the charge of misconduct on the part of counsel.

██ The issue of the wilful and wanton conduct of each plaintiff should not have been submitted to the jury; there was no evidence to warrant such an interrogatory. At the close of the case plaintiffs moved the court to withdraw the charge of wilful and wanton conduct from consideration of the jury; the motion was overruled, but it saves the issue for review. In Walsh v. Gazin, 316 Ill. App. 311, the court discussed the question of wilful and wanton conduct on the part of a plaintiff in a personal-injury action.

362

"Circumstances may be conceived," it said, "under which a pedestrian would be barred from recovery for injuries resulting from his own wilful conduct. . . . The law is well established that wilful and wanton conduct on the part of a plaintiff precludes recovery from a defendant who is also guilty of wilful and wanton conduct and a defendant has the right to raise an issue as to such conduct on the part of a plaintiff in a proper case." In the Walsh case plaintiff was crossing between a standing streetcar and the curb. There was a special finding that he was guilty of wilful and wanton conduct, but on appeal the court held that the finding was against the law and the evidence. ". . . in so far as we have been able to ascertain," the court stated, "it has never been held that a pedestrian was guilty of wilful and wanton conduct merely because of his failure to observe a rapidly approaching automobile until it was close upon him. . . . We are impelled to hold that the submission by the court to the jury of the special interrogatory as to whether plaintiff was guilty of wilful and wanton conduct constituted reversible error inasmuch as there is no evidence in the record to support the special finding that he was guilty of such conduct. Necessarily such finding was against the manifest weight of the evidence." In Goldschmidt v. Chicago Transit Authority, 335 Ill. App. 461, wilful and wanton conduct on the part of a plaintiff was again a consideration. There, plaintiff, not in the crosswalk area, was walking on the street in a direction parallel to the streetcar track and so close to the track as to bring himself into the path of the streetcar. The issue of wilful and wanton conduct was allowed to go to the jury. On appeal the court said the plaintiff should have made a motion to withdraw the issue from the jury, but because the record did not indicate that he had made such a motion he could not complain.

363

Lane v. Bobis, 340 Ill. App. 10, is the type of case that illustrates the conjecture of the court in the Walsh case when it remarked: "Circumstances may be conceived under which a pedestrian would be barred from recovery for injuries resulting from his own wilful conduct." The Lane case concerned a fatally injured automobile guest, rather than a pedestrian, but otherwise the facts fit the speculation of the Walsh case. In the Lane case defendant and his automobile guest were driving, with their two hunting dogs in the rear seat of the car. The dogs were not compatible and caused a disturbance; both men attempted to quiet the dogs, with the result that the driver lost control of the car; the guest died as a consequence of the injuries he sustained when the car went off the road. The court stated: "It is first argued that Bobis was guilty of wilful and wanton misconduct in allowing two strange dogs to be placed together in the car, knowing the tendency of such dogs to create a disturbance. If this be true, Lane was guilty of equal wilful and wanton misconduct, which is a complete defense to an action charging the same wrong. (Prater v. Buell, 336 Ill. App. 533.)" Rogers v. Chicago Transit Authority, 341 Ill. App. 46, goes beyond the tentative holding of wilful and wanton conduct on the part of the injured or dead party. In the Rogers case decedent deliberately stepped onto the rail of a streetcar track with the stated intention of stopping an approaching streetcar. On review, the court held that there was nothing to prevent decedent from stepping far enough away to avoid the danger created by his own deliberate conduct; the action of the decedent, the court held, warranted the finding, as a matter of law and fact, that he was guilty of wilful and wanton conduct which proximately contributed to bring about the mishap resulting in his death when struck by the streetcar, and the defendant, accordingly, was not liable for his death.

364

■ The submission of the issue of wilful and wanton conduct of plaintiffs here may, on first consideration, seem harmless, inasmuch as the jury found plaintiffs not guilty thereof in their answer to the interrogatories; nevertheless, since the question of negligence on the part of plaintiffs was also submitted to the jurors by special interrogatory, the jury may well have been led to conclude that plaintiffs were at least guilty of contributory negligence. We find no evidence in the record to support the special finding that plaintiffs were guilty of wilful and wanton conduct, and it was prejudicial error to submit this false issue to the jury.

■ As to the instructions generally, it appears that in this case the court gave thirty-nine instructions, nineteen at the request of defendant. Seven of these directed a verdict by the use of the peremptory clause "to find him [the defendant] not guilty," or its equivalent. Thus, in effect, more than a third of defendant's instructions directed a verdict for defendant. Both the Appellate and Supreme courts have reversed cases with a disproportionate number of instructions concluding with the clause "find the defendant not guilty" or otherwise directing a verdict for defendant. In Gulich v. Ewing, 318 Ill. App. 506, the court reversed a judgment entered on a verdict finding defendant not guilty. In that case there was undue emphasis in the instructions on finding defendant "not guilty." "The vice of such a charge," the court stated, "lies in the fact that it is 'calculated to impress the jury with the thought that the court was against the plaintiff on the question of fact and that they might readily be misled to believe that in the opinion of the court they should find for defendant.' Nelson v. Chicago City R. Co., 163 Ill. App. 98." In Daubach v. Drake Hotel Co., 243 Ill. App. 298, the undue number of such peremptory instructions was held to be reversible error,

whereas in City of Lake Forest v. Janowitz, 295 Ill. App. 289, seven instructions dealing with contributory negligence on the part of plaintiff, although correct in their statement of the law, were said to place undue emphasis on that aspect of the case and accordingly held to constitute reversible error. In Chism v. Decatur Newspapers, Inc., 340 Ill. App. 42, the court, after characterizing the case before it as a typical negligence action in which no unique legal points were involved, said: ". . . we see nothing about the case that should make the instructions so lengthy, involved and repetitious. The wise trend of the courts of this State is definitely against such instructions. Baker v. Thompson, 337 Ill. App. 327, and the cases therein referred to. . . . We are fully in accord with the view expressed in Baker v. Thompson, supra, and feel that when defense attorneys in negligence actions tender an excessive number of instructions, filled with repetition and containing many of a peremptory nature, they do so at their own peril in the event the case is reviewed. Such instructions cannot aid the jury members, but rather will hinder them in the performance of their duty of giving to each side a fair and impartial trial." Again, in Stone v. Warehouse & Terminal Cartage Co., 6 Ill.App.2d 229, the court used forceful language in criticizing such instructions: "The giving of an inordinate number of instructions peremptory in form and containing the phrase 'you should find the defendant not guilty,' or its equivalent, has been repeatedly condemned by our courts, and it has been said that in a close case excessive repetition of such a phrase is reversible error. Loucks v. Pierce, 341 Ill. App. 253; Alexander v. Sullivan, 334 Ill. App. 42; Baker v. Thompson, 337 Ill. App. 327. Here the evidence was in close conflict. We realize the extreme hardship placed upon a judge in a trial court who is urged to give an unlimited number of instructions

366

peremptory in form. With a little care on the part of counsel, instructions could be properly drawn which would present their theory of the case to the jury without repetition and without a request for a finding. The purpose of a lawsuit is to find the truth as nearly as it is humanly possible. In order to reach such a goal the trial court must have reasonable co-operation on the part of counsel. In any case the court could have, if he so desired, rejected the proffered improperly worded instructions and could have given instructions of his own properly stating the legal principles involved. Geiselman v. Strubhar, 302 Ill. App. 23; Muller v. Equitable Life Assur. Society, 293 Ill. App. 555. Still the primary duty rests on counsel. The present tendency in litigation is to depart from the ancient theory that a lawsuit is a contest of wits. There is an attempt to approach the ideal situation where a lawsuit is tried without a display of the guerilla tactics of surprise attack and without the prejudice which undoubtedly is engendered in the jury by the court repeating—almost as a matter of rote—at the conclusion of the instructions, the mandatory phrase instructing the jury to find specifically either for the plaintiff or the defendant." Randal v. Deka, 10 Ill.App.2d 10, is written in the same character as the Stone case. In the Randal case numerous peremptory instructions were given. After citing some of the cases referred to here and in the briefs in the present case, the court observed: "The warning contained in these decisions has not been heeded by many counsel who still seem to believe that in order to fulfill their duty to their client it is necessary that they overwhelm the trial court with a plethora of instructions peremptory in form. It would seem that many counsel have not as yet fully grasped the fact that the purpose of giving instructions is to enlighten the jury and not to create confusion. A constant repetition by the court in its

instructions to the jury of the peremptory demand that under certain circumstances they shall find for one party or the other may cause the jury to believe that the court has taken a definite stand upon the issues involved in the lawsuit. There is such a thing as a litigant being instructed out of court. Under the facts and circumstances in the case before us the court erred in giving the eight peremptory instructions which are objected to."

■ ■ Criticism is also leveled at defendant's instructions 26, 30, 32 and 34, two of which define "preponderance" as "that evidence which, when taken in connection with all the facts and circumstances in the case, is proof of its truthfulness." This, it seems to us, places a greater burden on the plaintiffs than the law requires. Attempts to define the phrase "preponderance of the evidence" have been considered by the courts at various times. The phrase needs no definition, the court said in Chicago City Ry. Co. v. Kastrzewa, 141 Ill. App. 10. It is imperative, however, that where counsel undertake to define it, they do so accurately and not in such a manner as to confuse or mislead the jury. All that the law requires to sustain the burden of proof is the probability of its truthfulness, not its truthfulness. We find no cases where "preponderance of the evidence" was ever defined as proof of its truthfulness. In Teter v. Spooner, 305 Ill. 198, the court, in discussing an instruction on the preponderance of evidence, held that in civil cases all that is required of the party having the burden of proof is to prove the issue by a preponderance of the evidence, and that an instruction which imposes a greater burden, such as to convince the jury, to satisfy the jury or prove to the satisfaction of the jury, and uses the adjectives "slight," "clear" or "perceptible" with reference to the preponderance of the evidence, is confusing to the jury and should not be given. See

also Wolczek v. Public Service Co., 342 Ill. 482, and Reivitz v. Chicago Rapid Transit Co., 327 Ill. 207.

Criticism is likewise leveled at instructions 24, 25 and 37, dealing respectively with sudden and unexpected peril, the duties of the parties, and the issue of plaintiffs' alleged contributory negligence. We consider it unnecessary to discuss the alleged impropriety of these instructions in view of our conclusion on the basis of what we have said with respect to the submission of the interrogatories as to the wilful and wanton conduct of plaintiffs, and the prejudicial effect of instructions defining preponderance of evidence, as well as the repetitious and mandatory form of many of the instructions submitted by defendant and allowed by the court. The evidence in this case was conflicting, and it was essential that the jury be properly instructed. Improper instructions, to put the matter metaphorically, throw the scales of justice off balance; such instructions can serve only to manipulate a jury, not to enlighten it; it cannot be supposed they will create a climate which will promote fair and impartial consideration of the respective merits of litigants.

The instructions as herein discussed were confusing and prejudicial to plaintiffs and, aside from other errors urged, require a reversal and the granting of a new trial. Accordingly, the verdicts and judgments of the Circuit Court are reversed, and the cause is remanded for retrial.

Verdicts and judgments reversed, and cause remanded for retrial.

BURKE, P. J., concurs.

BRYANT, J., took no part.