DALE HOUCK, Trustee, Plaintiff-Appellant, *v.* EDWARD MARTIN *et al.*, Defendants-Appellees.

Fourth District   No. 15599

Opinion filed March 21, 1980.—Rehearing denied April 21, 1980.

GREEN, J., specially concurring.

Marshall A. Susler and Darrell F. Parish, both of Owen, Roberts, Susler & Murphy, of Decatur, for appellant.

John E. Fick, of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellees Edward Martin, Audrey Martin and Carol Martin.

Brown, Hay and Stephens, of Springfield (Edward J. Cunningham and Mark H. Ferguson, of counsel), for appellee First National Bank of Springfield.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

On April 23, 1975, the plaintiff, serving as trustee in bankruptcy for the Martin Supply Company, which owned and operated a grain elevator, filed a multicount complaint against Edward Martin, Audrey Martin, and Carol Martin, and against the First National Bank of Springfield (FNB). Edward is the son of LeRoy, now dead, and Audrey; Carol is Edward's wife. The plaintiff sought to recover from Edward as the principal obligor on a $200,000 loan allegedly made by FNB to Edward and repaid with proceeds from insurance policies on LeRoy's life assigned by the company, as owner of the policies, to FNB as collateral for the loan. The plaintiff sought to recover from Edward, Audrey as executor of the estate of LeRoy and individually, and Carol on the basis of surety agreements signed by them at the time FNB allegedly loaned the $200,000 to Edward; the plaintiff sought contributions from these sureties, who had not repaid any of the loan. The plaintiff also sought to recover from Edward and Audrey on the theory that they were statutorily liable as corporate officers and directors for loans made to Edward, another corporate officer or director (Ill. Rev. Stat. 1977, ch. 32, par. 157.42—4). The plaintiff based his action against FNB on two theories: (1)

FNB had converted the insurance proceeds by failing to seek repayment of the loan from Edward, instead collecting insurance proceeds before the note was due; and (2) the assignment of the insurance policies was void because it created a preference in favor of FNB, defrauding the other creditors of the Martin Supply Company. This action proceeded to a three-day trial before a jury, beginning March 5, 1979.

Dale Houck testified that he became the trustee in bankruptcy on August 27, 1974. The bankruptcy court had authorized him to pursue this case. Some of the bankrupt's records were destroyed in a fire; the previous trustee had stored them in a building that burned down. He did not know whether the $200,000 loan proceeds were paid into the company's checking account with FNB. On September 9, 1974, he received $588.02 from FNB as the final balance in the company's checking account.

Russell Brannon, an auditor for FNB, testified that he had copies of several documents involved in the case, including microfilm copies of the notes; the originals had disappeared. Plaintiff tendered several exhibits: copies of the successive notes, the guarantees and assignments, and the bank loan officer's notes. Edward signed the original note and the 90-day renewal notes. As part of the security agreement for the loan, the company assigned FNB the beneficial interest in a land trust. Brannon said that no one, not even Edward, signed the loan application, and Edward did not sign the land trust assignment.

The next witness was Walter Mills, who was a loan officer at FNB at the time the $200,000 was loaned and had supervised the making of the loan. Mills explained that $20,000 was paid on the debt October 25, 1972, so the renewal note made that day was for only $180,000. LeRoy died February 9, 1973, during the life of the fourth note, and $52,075 was left on the indebtedness even after the insurance proceeds had been applied to the debt. A liability ledger showing balances on the loan from the date of the loan, April 28, 1972, until September 6, 1974, was introduced into evidence. Mills testified that the loan was made to Edward, not to the Martin Supply Company. FNB required the company to sign security agreements on the company's inventory and equipment, to give FNB the beneficial interest in a land trust, and to guarantee the loan. The loan guaranty agreements signed by the company, Edward, Carol, Audrey, and LeRoy are identical printed forms prepared by FNB. The signer jointly and separately guarantees payment of varying amounts on the loan. FNB also required that LeRoy sign a resolution of the board of directors of the company, authorizing the corporate guaranty. On the assignments of the life insurance proceeds, FNB was listed as the beneficiary. Other insurance policies secured loans made by FNB to the company; these loans are not related to that allegedly made to Edward

and involved in this case. The proceeds from all the policies securing corporate debts totaled $400,000; the proceeds earmarked for this debt, however, were insufficient to repay entirely the $200,000 loan, and a balance of approximately $52,000 remained, which was paid off by the sale of realty held in the land trust.

Over the plaintiff's objection, the court permitted counsel for the Martins to cross-examine Mills on discussions leading up to the actual signing of the loan document on April 28, 1972. FNB did not take a loan application from Edward, and he did not sign any financial statements. Counsel for the Martins introduced into evidence the deposit slip signed by Mills, depositing the $200,000 loaned in the company's checking account. Upon redirect examination, Mills testified that after LeRoy died, Edward had FNB loan more money to the company on February 22, 1973.

During the plaintiff's rebuttal, Mills testified that he had learned from another loan officer, who in turn had been told by LeRoy that the purpose of the loan was to help Edward buy approximately 200 shares of stock in the company. Mills also testified that he did not ask either LeRoy or Edward to fill out a loan application and that he did not know the value of the stock. Mills identified as his handwriting a notation on the loan application saying, "Issued 110 shares to Ed." Further, the purpose of the loan—financing Edward's purchase of stock—was discussed while the documents were signed. Mills testified that FNB took a security interest in everything owned by the company to guarantee the loan. He never saw a corporate resolution regarding the sale of shares to Edward.

Audrey Martin, LeRoy's wife, was called as a witness to testify for the plaintiff under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). Audrey's testimony revealed that although she had been an officer of the company, she knew little if anything about corporate affairs. She realized that she had been secretary of the company, but was not sure whether she had ever been vice president; she had signed minutes of meetings, yet was unfamiliar with the company's records. She said that she was a director and officer "on paper only." The plaintiff introduced into evidence copies of the minutes from shareholders' and directors' meetings of 1972 and 1973.

During the defendants' examination of Audrey it was brought out that LeRoy's signature does not appear on any minutes dated after 1970; the defendants were trying to show that the minutes of the various meetings were prepared after LeRoy's death but predated. Audrey testified that she never attended stockholders' or directors' meetings. She also said that LeRoy was the only one who owned stock in the company. The defendants then offered another exhibit, a certified copy from the Illinois Secretary of State of the company's annual report for 1972. The

1972 annual report was signed by LeRoy. The annual report lists LeRoy as president, Audrey as secretary, no one as treasurer, and one John Bullington, the family lawyer, as director. According to the report, the company was authorized to issue 1,000 common shares, with a par value of $100. Only 210 shares had been issued, however. The annual report is dated March 20, 1972. The minutes for the stockholders' meeting, held March 16, 1972, say that LeRoy, Audrey, and Edward were that day elected directors of the company. The minutes also say that LeRoy owned all the outstanding shares, 210. The minutes for the directors' meeting, also held March 16, 1972, say that LeRoy, Bullington, and Edward were the directors attending, and that LeRoy was elected president, Audrey, vice president and assistant secretary, and Edward, secretary and treasurer. LeRoy did not sign any of these minutes, although the stockholders' minutes has a blank for his signature, as chairman of the meeting. The plaintiff objected to the defendants' suggestion that the book of minutes was inaccurate; the plaintiff argued that the defendants could not attack the veracity of the witness and could not use parol evidence to contradict the written corporate minutes. The trial court overruled the objection and admitted the testimony. On the plaintiff's examination, Audrey testified that she signed documents without knowing what they were and that she did not know which was correct, the minutes or the annual report.

The defendants, too, called Audrey as a witness. She testified that she had worked parttime at the grain elevator. She did not read the corporate documents she signed because she had "complete confidence" in LeRoy. She did not go to FNB on April 28, 1972, the date the money was loaned, and did not remember attending any meeting at which Edward was elected an officer or director before LeRoy's death.

The plaintiff called Edward as a witness. He testified that he had been an officer in the company and had signed the notes payable to FNB. He did not repay any of the loan. On defendants' examination, Edward testified that he knew he was an officer because his father had told him he was one. He never attended any corporate meetings before LeRoy's death and never prepared minutes. Edward acknowledged that the minutes showed that he was elected secretary-treasurer and Audrey assistant secretary at the directors' meeting March 16, 1972. The plaintiff's exhibits were admitted without objection.

Edward, testifying for the defense, said that he had never applied for a loan from FNB. His net worth was about $7,500 on April 28, 1972. He went to the bank that day because LeRoy told him to do so; his father said that he was old enough to meet some of the bankers. He did not ask for a loan and signed the note only after his father told him to. Edward did not know what was done with the $200,000, but said that he never received it

personally. He did not fill out a deposit slip. At the time the loan was made he signed various papers at his father's request. As far as he knew, he had never received any money from the company except his salary and never owned any stock in the company. The night the loan was made, he first learned of being an officer in the company. At his father's request, he signed the notes renewing the loan. Edward never saw the corporate books before his father died; he signed some checks drawn on the account at FNB before his father's death, but did not fill them out. He never asked anyone to guarantee a loan for him.

Edward's testimony concerning ownership of the stock is confusing and often inconsistent. During cross-examination, Edward admitted that when he signed the notes he knew what he was doing and that the purpose of the note was for him to buy stock in the company. The day of the loan his father talked to him about his owning part of the company. He acknowledged his own and his father's names on signature cards from FNB; Edward's card designates him vice president of the company. For his own benefit, Edward traded commodities and had accounts in his own name.

Yet Edward also testified that LeRoy had never offered to sell him stock in the company, and that he, Edward, never told anyone at FNB that he wanted to buy stock. Still, when he and his father left FNB, the bankers congratulated him "on having purchased half the elevator."

Eleanor Rundel, the company's bookkeeper for 12 years, testified for the defendants that Edward was a regular worker for the company and that Audrey occasionally worked at the grain elevator. LeRoy kept the checkbook for the company's account at FNB.

Carol, Edward's wife, testified that to the best of her knowledge Edward never borrowed $200,000.

Lisle Marfell, the first trustee at bankruptcy, testified that some of the corporate records were destroyed in a fire.

No stock certificates were introduced into evidence at trial. The jury returned verdicts in favor of Edward, Audrey, and Carol, and the court entered judgment on the verdict on March 22, 1979. The plaintiff's post-trial motion was denied and an order entered May 7, 1979, effective April 17, 1979, *nunc pro tunc*. The plaintiff timely filed his notice of appeal May 14, 1979.

The plaintiff first argues that because Edward's signature appears on the notes, he was the principal obligor and should reimburse the company the amount of the note, plus interest. The plaintiff argues that the trial court erred in permitting parol evidence to establish an intent contrary to that evidenced by the notes. Specifically, the plaintiff argues that the jury should not have heard Edward testify that LeRoy obtained the loan and Edward merely did what his father requested. The defendants argue that

the company did not pay a disproportionate share of the debt because the company received the entire benefit of the loan; parol evidence is admissible, the defendants contend, to show that Edward received no consideration for signing the note.

■■ ■ Parol testimony is inadmissible to show that the parties originally intended that the maker of the note would not be held liable. The note bears an absolute promise to pay, and courts will not admit testimony contradicting the absolute promise to pay. (*Cusanelli v. Steele* (1936), 287 Ill. App. 490, 5 N.E.2d 296; *Tegtmeyer v. Nordlund* (1930), 259 Ill. App. 247.) Furthermore, parol is inadmissible to show that the maker's obligation is conditional rather than absolute. (*Chandler v. Chandler* (1945), 326 Ill. App. 670, 63 N.E.2d 272.) Parol evidence is admissible, however, to show the failure of consideration between the parties to a note. Ill. Rev. Stat. 1977, ch. 26, pars. 3—408, 3—305, 3—306.

In this case the jury reasonably could have inferred that Edward received no consideration for his signature on the note and thus should not be held liable for that amount. The testimony and documents show that none of the proceeds of the loan went to him personally. Edward's and the bankers' testimony show that the $200,000 was immediately deposited in the company's checking account at FNB; a deposit slip confirms this. Consideration for Edward's signature would exist if the money loaned went to the company and the company in turn gave Edward shares of stock. This is the plaintiff's theory, but the testimony regarding the issuance of stock conflicts. Mills, the bank officer, and Edward, on cross-examination, said that the parties intended that the money be used to pay for Edward's purchase of stock in the company. But Edward's testimony on direct examination and Audrey's and Carol's testimony assert that LeRoy did not intend that Edward buy stock in the company. The corporate records do not indicate that Edward ever owned stock, and the plaintiff failed to produce any stock certificates showing that Edward owned part of the company.

Assuming that FNB loaned Edward $200,000 secured by corporate assets, the plaintiff contends that Edward and Audrey are liable for what should be construed as a loan by the corporation to Edward, under sections 42.4 and 103 of the Illinois Business Corporation Act (Ill. Rev. Stat. 1977, ch. 32, pars. 157.42—4, 157.103). Section 42.4 provides that corporate directors are jointly and severally liable for loans made with their approval by the corporation to officers or directors; section 103 provides that a foreign corporation authorized to conduct business in Illinois—as was the Martin Supply Company, a Delaware corporation—is subject to the same restrictions and enjoys the same rights as a company incorporated in Illinois.

■■ The first question is whether the prohibition against loans to

212

corporate officers or directors applies to the Martin Supply Company, which was incorporated in Delaware. Section 103 has been interpreted to impose on foreign corporations doing business in Illinois "all the liabilities, restrictions, and obligations imposed upon domestic corporations" (*Vinylweld, Inc. v. Metropolitan Greetings, Inc.* (N.D. Ill. 1973), 360 F. Supp. 1360, 1362, *aff'd* (7th Cir. 1975), 519 F.2d 1406). Thus, the prohibition against loans to officers and directors applies to the Martin Supply Company.

The next question is whether Edward and Audrey were officers, assuming the loan was made. The plaintiff would rely solely on the minutes of the March 16, 1972, stockholders' meeting and would exclude all evidence contradicting those minutes as inadmissible parol evidence. The minutes and records conflict, however, and present significant inconsistencies. According to the annual report, only John Bullington was a director. According to the minutes of the directors' meeting held March 8, 1973, after LeRoy's death, Audrey and Edward had been serving as directors. Finally, according to the minutes of the stockholders' meeting held March 16, 1972, LeRoy, Audrey, and Edward were elected directors for the coming year, during which time the loan was made. These documents thus present discrepancies regarding who was a director when the loan was made. The testimony presents similar conflicts: Edward and Audrey do not know when they served in what capacities.

■ The plaintiff misapplies the parol evidence rule in trying to exclude subsequent corporate records as well as the testimony of the alleged officers and directors. First, the annual report was prepared after the minutes, and for that reason alone would not be excluded by the parol evidence rule, which prohibits introducing only prior or contemporaneous, not subsequent, agreements or discussions.

■ Furthermore, corporate minutes and other records are not instruments within the meaning of the parol evidence rule; the rule does not apply to documents that contain no obligations. Corporate minutes are not contracts or notes or bills. (See Annot., 48 A.L.R.2d 1259 (1956).) The parol evidence rule presupposes the existence of a written contract; thus, if the offered evidence attacks the validity or existence of the contract, the evidence is not proscribed.

Plaintiff argues that because the Business Corporation Act requires companies to keep records, the parol evidence should have been excluded under the rule announced in *Nelson v. John B. Colegrove & Co. State Bank* (1932), 265 Ill. App. 488, *aff'd* (1932), 351 Ill. 124, 184 N.E. 233. *Nelson* held that when a statute requires keeping a record, then the record is the only lawful evidence of the action taken, and parol evidence is inadmissible to contradict the record. Section 45 of the Business Corporation Act begins as follows:

"Each corporation shall keep correct and complete books and records of account and shall also keep minutes of the proceedings of its shareholders and board of directors; * * *." (Ill. Rev. Stat. 1977, ch. 32, par. 157.45.)

Section 45 requires corporations to maintain a list of their stockholders and permit them to inspect those books, records, and lists. Section 45 also provides a penalty for officers, agents, or corporations that wrongfully refuse a demand to examine those documents. The purpose of the statute is clearly to put corporate actions in the open, accessible to all shareholders.

In *Malone v. Melnick* (1954), 378 Pa. 483, 106 A.2d 806, the principal case in the annotation, the Pennsylvania Supreme Court ruled that parol evidence was admissible to contradict and clarify written corporate records. *Malone* has added significance because Pennsylvania corporation law, like that in Illinois, requires companies to keep records. The Pennsylvania statute in effect at the time *Malone* was decided is substantially similar to the Illinois statute that the plaintiff asserts limits the defendants to the evidence in the minutes (Pa. Stat. Ann. tit. xv, §1308 (1967)). Even if *Nelson* is applied to this case, the annual report, which the law requires to be filed, contradicts the minutes relied on by plaintiff, and parol should be admitted to explain the contradiction. On this basis, then, the evidence justifies inferring that Edward or Audrey was not an officer or director when the loan was made.

The plaintiff also argues that the trial court misled the jury by misdefining the word "loan." Over the plaintiff's objection, the trial court submitted to the jury an instruction offered by counsel for the Martins defining the word "loan." The instruction said, "A loan of money is a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equivalent to that which he borrowed." Specifically, the plaintiff argues that this definition is too narrow because it excludes situations in which a bank gives money to a company, which in turn issues stock to a shareholder, and the shareholder is indebted to the bank. The definition given by the trial court was taken from Black's Law Dictionary (3d ed. 1944).

Trial courts should define or explain only technical terms or arcane legal words and phrases that appear in jury instructions. (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247.) Words used in their conventional sense do not need to be defined or explained in instructing the jury. This issue raises two questions: Whether a definition of the word "loan" was necessary, and if the word did not need to be defined, whether giving this particular definition is reversible error.

First, "loan" did not need to be defined. Examining the cases that have decided what sort of words and phrases needs to be defined

discloses that the word "loan" is neither so technical nor so arcanely legal that a jury would need a definition to understand it. *Budovic v. Eschbach* (1953), 349 Ill. App. 163, 110 N.E.2d 477, held that "proximate cause" does not always need to be defined; error was not committed by failing to define that phrase. "Due care and caution" does not need to be defined. (*Stivers v. Black & Co.* (1942), 315 Ill. App. 38, 42 N.E.2d 349.) In *Chicago & Alton R.R. Co. v. Esten* (1899), 178 Ill. 192, 42 N.E. 954, the Illinois Supreme Court ruled that "prima facie" did not need to be defined when used in a jury instruction. *Hedge v. Midwest Contractors Equipment Co.* (1964), 53 Ill. App. 2d 365, 202 N.E.2d 869, ruled that "preponderance," "apparatus," and "installation" are common words and need not be defined. "Burden of proof" is so commonly used that it does not need a definition. (*Frank v. Davies* (1966), 66 Ill. App. 2d 271, 214 N.E.2d 297.) *Nowak v. Witt* (1957), 14 Ill. App. 2d 482, 144 N.E.2d 813, held that "an immediate hazard" did not need a definition.

"Statute of frauds" is a legal term that requires a definition if used in a jury instruction. (*Moshier v. Kitchell & Arnold* (1877), 87 Ill. 18.) Also, ordinary words used in unusual or technical senses need to be defined. *Assise v. Dawe's Laboratories, Inc.* (1972), 7 Ill. App. 3d 1045, 288 N.E.2d 641.

As all these examples show "loan" is an ordinary word commonly understood by jurors. A definition was unnecessary, and the refusal to define the word would not have been error. This raises the second question: Whether giving this definition was harmful error. When common words are misdefined in such a way that the jury will be confused as to the theory of the case, giving the definition may constitute reversible error. (*Pyatt v. Engel Equipment, Inc.* (1974), 17 Ill. App. 3d 1070, 309 N.E.2d 225; *Scerrino v. Dunlap* (1957), 14 Ill. App. 2d 355, 144 N.E.2d 859.) While the definition of "loan" was narrow and under-inclusive, with the record in this case we cannot say that giving that definition produced reversible error. Some errors are harmless; a trial need not be entirely free from error. When the entire record shows that the error has caused no injury or did not affect the outcome in the court below, then the error will be deemed harmless. *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.

The plaintiff also appeals from the dismissal of his original complaint and amended complaints against FNB to recover the insurance proceeds. The trial court relied on FNB's two affirmative defenses to the complaints. FNB argued first, that the terms of the assignment gave it the right to collect the insurance proceeds immediately, before the note was due, and second, that the same action was pending in another court, and thus the State court had to dismiss the action under section 48(1)(c) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 48(1)(c)). The plaintiff

argues that the assignment and guarantees present an ambiguity, and therefore the documents should be construed against the drafter, FNB. (*King Korn Stamp Co. v. Guaranty Bank & Trust Co.* (1969), 114 Ill. App. 2d 428, 252 N.E.2d 734.) FNB contends that the documents are unambiguous and clearly gave it the right to apply the proceeds to the note even though it was not yet due. The assignment of the life insurance as collateral for the loan provides:

"B. It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof:

1. The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;

2. The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy * * *.

* * *

E. The Assignee covenants and agrees with the undersigned as follows:

1. That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed;

* * *

J. In the event, of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment shall prevail."

The assignment clearly gave FNB the right to apply the proceeds against the debt before the note was due. We thus do not need to reach FNB's second defense, the pendency of the same action in another court.

Therefore we affirm the judgment entered on the verdict in favor of the Martins, and we affirm the dismissal of the complaint against FNB.

Affirmed.

TRAPP, J., concurs.

Mr. JUSTICE GREEN, specially concurring:

I concur with the determination that the judgments of the trial court should be affirmed.

I agree that the jury could have found that Edward Martin did not receive any of the proceeds of the loan. However, that would not mean

that there was no consideration for his execution of the note as maker. Consideration for the undertaking of the obligations of a note may be furnished by payment of money to a third party. (Restatement of Contracts §75(2) (1932).) That appears to be a possible explanation of what happened here as evidence showed that the proceeds of the loan were deposited to the account of Martin Supply Company. The jury could have so found. If so, Edward Martin would have been an accommodation maker, not liable to the party accommodated and between the two, parol evidence was admissible to show the accommodation. Ill. Rev. Stat. 1977, ch. 26, par. 3—415.

I do not agree that section 103 of the Business Corporation Act (Ill. Rev. Stat. 1977, ch. 32, par. 157.103) places all of the same restrictions on foreign corporations doing business in Illinois as upon domestic corporations when the *internal* affairs of the corporation are involved. We need not decide whether the provisions of section 42.4 of the Act (Ill. Rev. Stat. 1977, ch. 32, par. 157.42—4) are applicable to foreign corporations because the jury here could have determined that (1) the transaction involved here was not a loan to Edward Martin, or (2) Edward Martin was not a director. I agree that under the circumstances, parol evidence could be considered on these points.

I agree that no error occurred in the giving of the instructions.