2022 IL App (2d) 210707-U
No. 2-21-0707
Order filed September 7, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| VILLA OAKS, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff and Counterdefendant- | ) | |
| Appellee, | ) | |
| v. | ) | No. 16-L-622 |
| | ) | |
| RUBINA HOSPITALITY, LLC and | ) | |
| SOHAIL SHAKIR, | ) | |
| | ) | Honorable |
| Defendants and Counterplaintiffs- | ) | Bonnie Wheaton, |
| Appellants. | ) | Judge, Presiding. Border |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Trial court erred in granting summary judgment but cured its error.  It also erred in awarding certain damages.

¶ 2    This litigation arises out of a failed effort to build a banquet hall at a shopping center.  After a bench trial, the circuit court of Du Page County entered judgment in the amount of $5,012,147.14 plus costs in favor of the plaintiff and counterdefendant, Villa Oaks, LLC.  The defendants and counterplaintiffs, Rubina Hospitality, LLC (Rubina), and Sohail Shakir, appeal both that judgment and the trial court's prior entry of summary judgment on one of their counterclaims.  We granted

Villa Oaks' motion to dismiss the appeal as to Rubina on the grounds that it was untimely, but permitted the appeal to proceed as to Shakir. See *Villa Oaks, LLC, v. Rubina Hospitality, LLC*, No. 2-21-0707 (unpublished order dated Aug. 9, 2022). We now affirm in part and vacate in part, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4      Villa Oaks owns a shopping center on Roosevelt Road in Villa Park. Villa Oaks is owned by Farhad Nikanjam, who also owns and operates several other shopping centers and commercial properties. Rubina is owned by Shakir and his wife. Shakir is a developer who has financed, built, operated, and sold multiple commercial properties including gas stations and hotels in the last few decades.

¶ 5      In 2012, Shakir met with Nikanjam regarding the possibility of developing a banquet hall in the shopping center. Through their respective LLCs, they eventually entered into a ground lease (2012 Lease) for a space in between two of the existing buildings in the shopping center. A ground lease permits the lessee to improve the property in specified ways but the lessor retains ownership of the property as well as any improvements. The 2012 Lease permitted Rubina to construct a 30,000-square-foot banquet hall and related improvements on the space. Rent of $10,000 would commence after the building was constructed and passed inspection, and Rubina had the option to purchase the property within the first two years after that. Villa Oaks agreed to lend up to $1 million to help finance the construction costs. Shakir guaranteed the lease.

¶ 6      Shakir was unable to obtain financing. At trial, he testified that this was because banks typically would look to the Small Business Administration (SBA) to provide additional financing, and the SBA would not finance projects without a secured interest in the underlying property. The 2012 Lease terminated due to the lack of financing.

¶ 7    On May 7, 2013, the parties entered into a second agreement, a commercial real estate purchase agreement (Purchase Agreement) under which Rubina would purchase the property for $1.7 million. The purchase was contingent on Rubina obtaining financing to construct a banquet hall on the property. Villa Oaks again agreed to lend up to $1 million toward construction costs.

¶ 8    Both parties began taking steps to fulfill their duties under the Purchase Agreement. Villa Oaks relocated tenants and demolished two adjacent spaces to provide room for the project, and rebuilt exterior walls. Shakir hired an architect and a construction manager and made trips to Pakistan and China where he bought restaurant equipment and supplies for the banquet hall, which he stored in a vacant store in the mall. He also bought a large LED sign that he intended to use for the banquet hall. In November 2013, a bank issued a letter conditionally approving a loan to Shakir. In January 2014, Shakir erected a construction fence around the property.

¶ 9    Although the parties disputed the circumstances surrounding this event, it is undisputed that, in February 2014, the parties signed another agreement, a new ground lease for the property (2014 Lease). Similar to the two previous agreements, the 2014 Lease permitted, but did not require, Rubina to construct a banquet hall on the property:

> "[T]he Lessee may construct on the Premises a footprint of a structure as identified in the Site Plan (Exhibit B). Such construction shall be at Lessee's sole cost and expense and shall be performed in a good and workmanlike manner, free and clear of mechanics' and materialmen's liens. In the event Lessee is unable to obtain all permits and approvals required for such construction and for operation of its business on the Premises within the time period provided for in Article 23 of this Lease, Lessee shall have the option to terminate this Lease."

As with the 2012 Lease, the 2014 Lease provided that any improvements to the property except for certain fixtures would become the property of Villa Oaks whenever the lease terminated or expired, although Rubina had an option to purchase the property throughout the term of the lease. The term of the 2014 Lease was defined as 20 years from the day after "the improved premises" passed final inspection and was approved for occupancy, with options to renew. Rent was $15,000 per month. Somewhat confusingly, the provision on rent stated that it was due each month during the term of the lease (that term being defined above as starting upon occupancy approval), and also that rent would become due on the earlier of 18 months after Rubina took possession of the property or 4 months after the occupancy approval.

¶ 10    The 2014 Lease set out two possible remedies for default by the lessee, each depending on the type of default. For a failure to pay rent, Villa Oaks' sole remedy was to notify Rubina in writing of the default and then, if it were not cured within 45 days after receipt of the notice, declare "the forfeiture" of the lease by sending another written notice. Thirty days after receipt of the second notice, the lease would expire and terminate completely, and "all rights of Lessee, including occupancy***, shall expire and Lessee shall be relieved of all liability for any future rent or any other sums otherwise due from the date of such termination." For any other kind of default by Rubina, Villa Oaks could notify Rubina of the default and, if not cured within 30 days, could cure the default itself and charge Rubina for the expense of doing so, but no termination of the lease would result.

¶ 11    Among the conditions subsequent identified in the 2014 Lease were the relocations and demolitions already performed by Villa Oaks and the condition that Rubina obtain all necessary licenses, permits, and approvals for the construction and operation of the banquet hall and sign. The 2014 Lease contained an integration clause, stating that "[t]his Lease merges all prior

negotiations and understandings between the parties and constitutes their complete agreement." As he had with the 2012 Lease, Shakir personally guaranteed the "full, prompt, complete and faithful performance *** by the Lessee of all the obligations, covenants and conditions of the Lease."

¶ 12    Despite obtaining a conditional loan approval from a bank, Shakir was never able to get the permits he needed or financing for the project.  In August 2014, the project architect recorded a mechanics' lien against the property for work performed between 2012 and 2014, stating that, although Shakir had paid him more than $329,000, Shakir still owed him over $70,000 more.

¶ 13    On May 24, 2016, Villa Oaks' lawyers sent Rubina and Shakir a letter and a "5 Day Notice to Quit."  The letter stated that Rubina had defaulted on the 2014 Lease by permitting the recording of the mechanics' lien and advised that, if the default were not cured within 30 days, Villa Oaks would discharge the lien and charge Rubina for its expenses to do so, including attorney fees.  The five-day notice stated that rent had begun accruing on September 15, 2015, and as of the date of the notice, $245,539.72, was due and owing.  The notice further stated that failure to pay the rent in full and to vacate the premises "will result in forfeiture of the Lease and will permit the Landlord to institute legal proceedings against you to recover rent, damages, and possession" of the premises.  The five-day notice also reserved "all the rights and remedies provided under the rental agreement."  Rubina did not remove the lien and did not pay the rent.

¶ 14    On July 12, 2016, Villa Oaks filed a two-count complaint against Rubina and Shakir. Count I alleged breaches of the 2014 Lease including the defaults noted in the May 2016 letter and five-day notice and also alleged that Rubina "failed to commence construction of the planned Banquet Hall at the Premises or to notify the Plaintiff timely of its intentions with respect to same." It sought from Rubina possession and damages including the past-due rent, all future rent and other

expenses accruing through the date when it was able to relet the premises, an amount sufficient to cure the mechanics' lien, plus interest and costs including attorney fees. Count II sought the same damages from Shakir as guarantor. On August 15, 2016, the trial court entered an order granting Villa Oaks possession of the property and reserving the issue of damages.

¶ 15 The defendants filed a counterclaim asserting that the 2014 Lease was a sham, signed at Nikanjam's request, based on his representations that he needed evidence of a leasehold in order to refinance the shopping center, and that the operative agreement between the parties was the Purchase Agreement. In its final amended form, the counterclaim alleged claims of breach of the Purchase Agreement (count I) as well as conversion (count II) arising from allegations that the restaurant equipment stored at Villa Oaks had disappeared and Villa Oaks was using, for its own purposes and without permission, the LED sign.

¶ 16 Villa Oaks moved for summary judgment on count I of the counterclaim, arguing that the integration clause of the 2014 Lease conclusively established that it was the operative agreement between the parties. The defendants' response attached an affidavit from Shakir averring that Nikanjam had told him that the 2014 Lease was needed for refinancing purposes but was not intended to affect the Purchase Agreement, which was still the operative agreement. The trial court agreed with Villa Oaks' argument that the affidavit was parol evidence that could not be considered. It further found that, under the integration clause, the 2014 Lease was the operative agreement between the parties and granted summary judgment in Villa Oaks' favor on the counterclaim for breach of the Purchase Agreement.

¶ 17 The remaining issues went to trial in November 2016. Nikanjam testified regarding the parties' various agreements. He acknowledged that the reason that the parties entered into the Purchase Agreement in 2013 was that the SBA would not loan Rubina the money for the banquet

hall project unless Rubina owned the land, and agreed that both Villa Oaks and Rubina fulfilled many of the requirements of the Purchase Agreement prior to entering into the 2014 Lease (which listed those same requirements). He denied ever telling Shakir that the 2014 Lease would not affect the prior Purchase Agreement or that it was simply a sham agreement needed for his own refinancing of the shopping center. He presented evidence that he and Shakir met with his bank in November 2013, and Shakir and his wife signed a subordination agreement confirming that Rubina's interest in the Purchase Agreement was subordinate to the bank's interest in the shopping center. Asked if the 2014 Lease were not doomed by the same unavailability of financing for ground leases that doomed the 2012 Lease, Nikanjam asserted that Shakir was wealthy enough to have financed construction of the banquet hall himself if he had chosen. He agreed that Shakir had told him that Shakir could not get financing for the project despite the conditional approval letter from the bank.

¶ 18    Regarding the conversion counterclaim, Nikanjam agreed that he was using the LED sign, but said that he thought the sign had become the property of a third party, Indus Kitchens, that Shakir had invested in, which operated a restaurant at the shopping center and allowed the shopping center to use the sign. As for the restaurant equipment, Nikanjam said that he had required it to be moved when a tenant had rented the space where it was stored, but he did not know anything about its ultimate disposition.

¶ 19    Villa Oaks also presented the testimony of Matthew Smetana, a retail real estate broker, regarding efforts to relet the property. He began searching for tenants for the property in late 2015. He was not able to secure a tenant until May 2019, when Ross Dress for Less signed a 10-year lease of the space for $19,250-$20,166 per month. Bruce Sterling, a general contractor with

experience in preparing commercial construction bids, testified regarding his estimate that it would cost about $3.5 million to build out the space at issue for Ross Dress for Less.

¶ 20   Shakir testified regarding the 2014 Lease, asserting vigorously that Nikanjam had repeatedly pestered him to sign it, that he had signed it only as a favor to Nikanjam, and that both parties always regarded it as a sham. Confronted with a February 2014 email from himself to Nikanjam in which he asked Nikanjam to sign the 2014 Lease, Shakir testified that it meant only that, as Nikanjam was the one pushing the 2014 Lease, Shakir wanted him to sign it first. However, Shakir also verified emails reflecting his attorney's statements about the terms that would be acceptable to Shakir, indicating that Shakir was involved in negotiating the 2014 Lease. Shakir also identified emails sent to his architect in March 2015 regarding pulling permits, indicating that at that point he was still actively pursuing the project but did not have financing.

¶ 21   On his counterclaim for conversion, Shakir testified regarding the value of the restaurant equipment and stated that Nikanjam had given him permission to store it in an unused space in the shopping center. When he later asked a Villa Oaks employee to open the space so he could retrieve it, the employee told him that there was nothing in the space. Shakir admitted, however, that he did not know who had access to the space while the items were stored there and did not know what had happened to them. Further, he had opened a different restaurant around that time. Lastly, he testified as to the value of the LED sign and said he had not given anyone permission to take or use the sign.

¶ 22   In closing, Villa Oaks argued that Rubina had breached the 2014 Lease by failing to pay rent and not curing the mechanics' lien, and that they had proven their damages, while Rubina had not proven any damages on the counterclaim. As for the cost of constructing a new building, that should be considered part of the mitigation damages. The defendants argued that the five-day

notice stated that the 2014 Lease was terminated if the past-due rent was not paid, and as that rent was not paid, under the lease no further rent was due and owing after that point. They also argued that they had proved their counterclaim for conversion and those damages.

¶ 23    The trial court ruled in favor of Villa Oaks on its breach of contract claim. As part of that, the trial court confirmed its earlier ruling that the 2014 Lease was the operative agreement between the parties, saying that Shakir's testimony that it was a sham lease was contradicted by the timeline of the Villa Oaks refinancing, which had closed prior to the signing of the lease, and was not credible. The trial court also found that, despite the language of the 2014 Lease regarding default for nonpayment of rent and the language of the five-day notice regarding forfeiture of the lease, the lease had not terminated, and Villa Oaks could recover the future rent due under the 2014 Lease minus the value of the new lease (a net of $1,198,632.90) plus the cost of mitigating those damages ($132,000).

¶ 24    The trial court then continued:

> "Under the terms of the 2014 ground lease, ownership of the building had it been built would have reverted to Villa Oaks at the end of the lease term of 20 years. The testimony was that the defendant Rubina was intending to finance $4.5 million for the construction of the purchase of the land and the construction of the building, and $1 million for the equipment and outfitting of the restaurant or the banquet hall.
>
> Although it is difficult to determine what the value of a 20-year old building would be 20 years in the future, I think it's not unreasonable to believe that even with depreciation, when you factor in depreciation plus inflation, that it would be about the same as the construction cost would be today, so I think the value of the building, which would enure [*sic*] to the benefit of the plaintiff at the end of the 20-year period, would be equivalent to

the $3.5 million figure, and the—there is necessity, of course, of retaining an architect as well, so I think that that architectural element of damages is not unreasonable."

The trial court entered a judgment of $5,012,147.14 plus costs against Rubina and Shakir jointly and severally, and of $144,580.42 in interest against Shakir only. As for the counterclaim, the trial court found that Rubina had not proven that Villa Oaks, rather than someone else, converted the restaurant equipment, but the evidence showed Villa Oaks' conversion of the LED sign. It therefore awarded Rubina $129,000 in damages on the counterclaim. This appeal followed.

¶ 25                                   II. ANALYSIS

¶ 26            A. Finding That the 2014 Lease Was the Operative Agreement

¶ 27    Shakir first argues that the trial court erred in determining that the 2014 Lease was the operative agreement between the parties and granting summary judgment on his counterclaim for breach of the Purchase Agreement, because his affidavit was admissible evidence demonstrating a substantial factual dispute over whether the parties ever intended that the 2014 Lease become effective. He notes that "[t]he parol evidence rule presupposes the existence of a written contract; thus, if the offered evidence attacks the validity or existence of the contract, the evidence is not proscribed." *Houck v. Martin*, 82 Ill. App. 3d 205, 212 (1980). Further, the existence of a contract is a question of fact that ordinarily is inappropriate for resolution by summary judgment unless the facts are undisputed. "The existence of a contract, its terms, and the parties' intent are questions of fact to be determined by a trier of fact. [Citation.] Only when no factual dispute exists does the issue of a contract's existence become a question of law for the court." *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 19. Villa Oaks argues that accepting this argument would vitiate the parol evidence rule by allowing parties to disclaim duly signed contracts simply by averring that they did not intend those contracts to be binding.

¶ 28    Shakir is correct that the issue of whether a valid contract was formed is an issue of fact, not of law, and there was conflicting evidence on that issue. Thus, the trial court erred in entering summary judgment. The trial court cured its own error, however, by effectively reconsidering its ruling through its actions at trial. It permitted the parties to introduce evidence on this issue, weighed the evidence, and ultimately resolved the issue as the finder of fact. The record does not reflect that the trial court restricted the parties' abilities to present evidence on this issue in any way, and Shakir has not identified any evidence that he would have presented at trial but for the grant of summary judgment. Thus, this issue was in fact resolved following an evidentiary trial, not through the entry of summary judgment. We note that, although the trial court referred to its earlier ruling granting summary judgment, it expressly supported its continued adherence to that ruling by finding that *the evidence at trial*, including its credibility assessment of the various parties' testimony, showed that the 2014 Lease was not intended to be a sham. Because the trial court determined this issue based on the evidence presented at trial despite its earlier grant of summary judgment, that summary judgment was effectively vacated, merging into the final judgment. See *In re Estate of Funk*, 221 Ill. 2d 30, 85 (2006) (where summary judgment order was arguably erroneous but "the circuit court proceeded to finally resolve the case based on all the evidence which had been presented," "[a]ny error thereupon merged into the final judgment rendered by the court").

¶ 29    In this court, Shakir argues only that the trial court should not have disposed of this issue via summary judgment, not that its ultimate factual finding was against the manifest weight of the evidence. Thus, he has forfeited any review of the trial court's finding itself. Even if he had not, however, the evidence in the record—including the fact that Nikanjam's refinancing had closed before the 2014 Lease was signed, that Shakir was involved in the negotiation of that lease, and

the trial court's assessment, based on its observations at trial, that Shakir's testimony on this issue was not credible—amply supports the trial court's finding. See *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007) (courts will not reverse the judgment in a bench trial unless it is against the manifest weight of the evidence; that is, unless "the opposite conclusion is clearly evident or the [factual] finding is arbitrary, unreasonable, or not based in evidence"). We therefore affirm the trial court's ruling that the 2014 Lease was the operative agreement between the parties.

¶ 30                           B. Damages Obtainable Under the 2014 Lease

¶ 31    Anticipating that we might affirm the trial court's conclusion that the 2014 Lease governed the parties' obligations to each other, Shakir raises several arguments about the scope of damages available under that contract, arguing that the trial court erred as a matter of law in interpreting its terms. We address each argument in turn.

¶ 32                                    1. Future Rent

¶ 33    In announcing its judgment from the bench, the trial court found "as a matter of law" that the 2014 Lease had not been terminated, and thus Villa Oaks was entitled to the entire rent that would have accrued during the 20-year term of the lease (less mitigation). The trial court justified its ruling by noting that, under Illinois law, a landlord "always has the option of pursuing a forcible entry and detainer action," which was what had occurred here. Shakir argues that the trial court erred and that its finding rested on a misreading of the terms of the lease. The construction of a contract is an issue of law, which we review *de novo*. *Gallagher v. Lenart,* 226 Ill. 2d 208, 219 (2007). "The primary objective in construing a contract is to give effect to the intent of the parties." *Id*. at 232. The language of a contract is the best indication of the parties' intent. *Id*. at 233. If

that language is clear and unambiguous, it must be given its plain and ordinary meaning, without extrinsic aids of interpretation. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011).

¶ 34    We begin with the trial court's explanation of its ruling, which rests on an error of law. Although the trial court was correct that a landlord may sue to recover possession and rent under the applicable statutes, that legal right does not mean that it may proceed contrary to the valid terms of the underlying lease. *Spanish Court Two Condominium Ass'n v. Carlson*, 2014 IL 115342, ¶ 20 (although aspects of the landlord-tenant relationship may be governed by state and local laws, the relationship is created through the agreement of the parties and is contractual in nature). Nor may a landlord pursue eviction, thereby terminating the leasehold, and simultaneously seek damages for rent not yet due—at least, not without a contractual right to do so.

¶ 35    Villa Oaks contends that, because the five-day notice reserved "all rights and remedies" provided under the lease and no such rights were waived, the notice did not terminate the lease. Shakir rejoins that this language only preserved Villa Oaks' preexisting rights under the lease, but that lease provided only one option in the event that Rubina defaulted by failing to pay rent: Villa Oaks could notify Rubina of the default and demand payment, and if payment were not made, terminate the lease. The lease further expressly provided that Rubina would "be relieved of all liability for any future rent or any other sums otherwise due" after the date of such termination. Shakir argues that this is just what Villa Oaks did: it notified Rubina of a default by sending the five-day notice demanding payment of past-due rent, and when Rubina did not pay within the specified time period,[1] the lease terminated. In addition, the five-day notice itself advised that

---

[1] The language of the five-day notice, granting only five days for payment in full, conflicts with the terms of the lease, which gave Rubina 45 days to make such payment. However, as it is

Rubina's failure to pay in full within the specified period "*will* result in forfeiture of the lease." (Emphasis added.) Thus, he argues, neither he nor Rubina is liable for any rent or other amounts that accrued after that.

¶ 36    Villa Oaks argues that the lease required it to send two notices of default before termination would occur, but it only sent one. Thus, it argues, the lease did not terminate. But Villa Oaks did not simply send a notice here, it sued to evict Rubina and was awarded possession of the premises on August 15, 2016. It is well settled that "when a landlord successfully litigates its forcible action, the landlord-tenant relationship ceases and, except for any money judgment for past due rent, the tenant's rental obligation terminates." *Id.* ¶ 22.

¶ 37    Villa Oaks also argues that it was entitled to the benefit of its bargain, which included the payment of rent for 20 years. But as we discuss in greater detail below, the lease was replete with provisions allowing Rubina to terminate it at any point regardless of any breach. (The lease also permitted Rubina to purchase the property at any point during the lease, which would similarly have cut off rent payments.) Thus, the amount eventually to be collected under the lease was uncertain. And although the parties could have included a provision in the lease that would have preserved Villa Oaks' right to collect this future rent even after terminating Rubina's tenancy and regaining possession of the premises (see, *e.g.*, *Elliott v. LRSL Enterprises, Inc.*, 226 Ill. App. 3d 724, 729-730 (1992)), they did not do so. To the contrary, they included a provision explicitly cutting off the obligation to pay future rent once the lease was terminated.

---

undisputed that Rubina did not pay within either period, and as the eviction was filed more than 45 days after the notice, this conflict has no legal significance.

¶ 38    Thus, Rubina's obligations under the lease terminated on August 15, 2016, when Villa Oaks obtained possession of the property.  The trial court's award of damages for future rent accruing after that point must be vacated.

¶ 39                              2. Cost to Construct a Building

¶ 40    In addition to awarding damages for rent that accrued after the termination of the lease, the trial court also awarded the costs of building out the space where the banquet hall would have been, reasoning that Villa Oaks eventually would have taken possession of a building if Rubina had not breached the lease.  Shakir argues that this award is clearly contrary to the terms of the lease.

¶ 41    Villa Oaks first contends that Shakir should not be permitted to raise this argument on appeal because he did not raise it in the trial court.  That is not quite the full story of how things proceeded in the trial court, however.  In its complaint, Villa Oaks sought damages for breach of contract that included back rent, future rent until it could relet the premises, the cost of removing the mechanics' lien from the property, interest and attorney fees.  It did not list the cost of a building as an element of damages it was seeking.  At some point, however, Villa Oaks apparently decided to seek such damages, hoping to pass on to Rubina the cost of building out the space for its new tenant, Ross Dress for Less.  Villa Oaks characterized these construction costs as part of its "mitigation of damages," asserting that it was a necessary expense to relet the property.  But this characterization overlooks the fact that the property to be "relet" was (just as it was when Rubina leased it) vacant property, unimproved with a building.  Villa Oaks could not, under the guise of "mitigation," charge Rubina with the cost of constructing a building so that it could lease out an improved site rather than an unimproved one.  Villa Oaks has tacitly admitted as much by failing to cite a single authority that would justify such an approach.

¶ 42    And indeed, the trial court did not accept Villa Oaks' argument that this construction cost should be imposed as part of "damages mitigation." Instead, the trial court misread the 2014 Lease to impose on Rubina the obligation to construct a building, and then awarded the cost of doing so as part of the consequential damages flowing from Rubina's breach. Rubina had no opportunity to argue against this misreading in the trial court because it could not have anticipated that the trial court would misread the lease in this way. Accordingly, we decline to find Rubina's argument forfeited. See *People v. Jackson*, 2020 IL 124112, ¶ 118 (rules of forfeiture bind the parties, not the court, which may overlook them in the interests of maintaining a sound body of precedent).

¶ 43    The trial court's award of construction costs was based on a misreading of the terms of the lease. Despite the goal, expressed in multiple provisions of the lease, that the project would result in the building of a successful banquet hall, the lease also contains multiple provisions showing that the parties clearly understood that construction was contingent upon a host of factors, including Rubina obtaining the necessary financing, permits, and other requirements for construction.

¶ 44    To begin with, paragraph 3 of the contract states clearly that Rubina was permitted but not required to construct a building on the site, saying that "the Lessee *may* construct" (emphasis added) such a building, not that it "will" or "shall" or "must" do so. This language, which is clear and unambiguous, must be given its plain and ordinary meaning. *Thompson*, 241 Ill. 2d at 441. This plain meaning is supported by a provision of the same paragraph, stating that if Rubina was "unable to obtain all permits and approvals required for such construction and for operation of its business" on the premises, it had "the option to terminate this Lease."

¶ 45    Paragraph 22 of the lease required Villa Oaks to lend Rubina up to $1 million toward its construction costs, but only if Rubina had first "obtained adequate finance to complete the balance

of construction" and the building's roof was on. Paragraph 23 listed a host of conditions subsequent including Rubina's securing of all required licenses, permits, and approvals to construct and operate the building, and stated that, if the conditions were not timely completed, "then this Lease may be terminated" after written notice. Paragraph 23 further provided that if, using reasonable business judgment, Rubina determined that there was a reasonable likelihood that one or more of the conditions subsequent would not be satisfied, or that the permitting for the construction or operation of the banquet hall would be economically impractical, Rubina could terminate the lease at any time.

¶ 46    All of these provisions reflect the parties' understanding that the banquet hall might never be built and that Rubina could terminate the agreement and walk away at any point. Villa Oaks protests that reading the lease to allow but not require the construction of a building would be absurd and unfair, given that it undertook substantial costs and the demolition and reconstruction of surrounding stores in furtherance of the project. But the record is clear that the lease placed all of the construction costs on Rubina and that Rubina also made substantial outlays in pursuit of the project's success. It is neither unconscionable nor absurd to give effect to the plain language of the parties' agreement, which did not require Rubina to construct a building.

¶ 47    Because the 2014 Lease did not impose any obligation on Rubina to construct and deliver a building to Villa Oaks, Rubina's failure to do so cannot result in any damages. "A court has no authority to compel a party to do something different from what he agreed to do by contract." *Young v. Kowske*, 402 Ill. 114, 117 (1949). The award of damages for construction costs or the value of a building must be vacated.

¶ 48                                          3. Past Due Rent

¶ 49 In a final attempt to reduce damages, Shakir argues that the obligation to pay rent never commenced because the term of that rent obligation, as defined in the lease, had not yet occurred when this suit was filed. We reject this argument.

¶ 50 Shakir's argument rests on the fact that the lease contains several contradictory-seeming provisions about when the "term" of the lease began. Paragraph 4 states that "[u]nless sooner terminated or extended as herein provided, the term of this Lease shall be twenty (20) years (the 'Term') commencing on the first day after the improved Premises has passed final inspection and is approved for occupancy (the 'Term Commencement Date')." The next paragraph of the lease adopts this same definition, stating that Rubina will pay to Villa Oaks rent of $15,000 "per month for each and every month during the Term." These two provisions indicate that Rubina's obligation to pay rent would commence only once the building had been constructed and had obtained an occupancy permit, *i.e.*, once operations could commence. However, paragraph 5 also defined a new term, the "Rent Commencement Date," which was the earlier of 18 months after the premises were delivered to Rubina (that is, Rubina was given access to the property under the lease) or four months after final inspection and occupancy approval of the building. This provision identified two new possible dates when Rubina's rent obligation would commence, neither of which was the same as the "Term Commencement Date" identified in paragraph 4.

¶ 51 These seemingly conflicting provisions make the terms of the lease ambiguous. See *West Bend Mutual Ins. Co. v. Talton*, 2013 IL App (2d) 120814, ¶ 19 ("if the language of a contract is susceptible to more than one meaning, it is ambiguous"). Nevertheless, Villa Oaks points out that courts attempt to give effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.,* 223 Ill. 2d 352, 362 (2006). Conflicting provisions should be reconciled and harmonized if

possible so as to give effect to all of the contract's provisions. *Coe v. BDO Seidman, LLP*, 2015 IL App (1st) 142215, ¶ 27. "Generally, if contractual provisions conflict or create an ambiguity, the more specific provision controls." *Id*.

¶ 52　　Here, the definition of the lease's "Term" in paragraph 4 is the more general provision, having application to contractual obligations beyond the obligation to pay rent. By contrast, the definition of the "Rent Commencement Date" in paragraph 5 is specific to that rent obligation. Moreover, it has a more narrow purpose: to set an outer limit on the period before rent would become due, as evidenced by the requirement that rent payments commence on the earlier of the two dates given. Under these circumstances, we read the more specific provision as controlling. Rubina's obligation commenced 18 months after the contract was signed, on September 15, 2015. (This is the date both parties have used as the 18-month deadline, and thus we adopt it as the relevant date.)

¶ 53　　Although the trial court did not err in awarding damages for the rent due and owing between September 15, 2015, and August 15, 2016 (the date on which the lease terminated and Rubina's rent obligation ceased), that amount does not appear separately in the record. We therefore remand for a proper calculation of the back rent owed by Rubina for that period.

¶ 54　　　　　　　　　　　　　　III. CONCLUSION

¶ 55　　For the reasons stated, the judgment of the circuit court of Du Page County is affirmed as to the trial court's ruling that the 2014 Lease was the operative agreement between the parties and its finding that Rubina breached the lease, vacated as to the trial court's calculation of damages, and remanded for the recalculation of damages in a manner consistent with this decision.

¶ 56　　Affirmed in part and vacated in part; remanded.